LA ROSA, Appellant, vs. HESS, Respondent.

*February 6—March 6, 1951.*

*Alexander Lakes* of Milwaukee, for the appellant.

For the respondent there was a brief by *Affeldt & Lichtsinn,* attorneys, and *Eldred Dede* of counsel, and oral argument by *Karl M. Anderson* and *H. F. Lichtsinn,* all of Milwaukee.

FAIRCHILD, J. Reformation of an instrument cannot be made if the only grounds shown are that one party misunderstood the legal effect of the writing or because each of the parties gave his peculiar interpretation to it. But the reformation of a contract may be accomplished by a suit in equity where the evidence convinces the court that the true intent of the parties differed from the contract as reduced to writing, and that by some mistake or fraud the real intent was not truly represented in the writing. In *Kadow v. Aluminum Specialty Co.* 253 Wis. 76, 78, 33 N. W. (2d) 236, it was said:

"It is argued that testimony of parties, equally credible, does not support reformation. *Sable v. Maloney* (1880), 48 Wis. 331, 4 N. W. 479. This does not prevent reformation being established by evidence of circumstances and the nature of the transaction and the conduct of the parties in relation thereto, provided the natural and reasonable inferences to be drawn therefrom clearly and decidedly prove the alleged mistake. *Sable v. Maloney, supra; Geib v. Reynolds* (1886), 35 Minn. 331, 28 N. W. 923; *Layman v. Minneapolis Realty Co.* (1895), 60 Minn. 136, 62 N. W. 113; 53 C. J., Reformation of Instruments, p. 1037, sec. 202."

In judging the evidence submitted in this case, we are to have in mind that rule requiring that the clear and convincing

evidence must show either a mutual mistake resulting in the phrasing of the contract or that the acts of the party claiming the advantage of a misused word or clause amounted to a fraud upon the other party. In either event, in cases where, by accident, mistake, or fraud a party has an unfair advantage in a proceeding at law which must necessarily make the court an instrument of injustice and it is therefore against conscience that he should use the advantage, a court of equity will interfere and restrain him from using that advantage. *Dane v. Derber,* 28 Wis. 216; *Kuester v. Rowlands,* 250 Wis. 277, 26 N. W. (2d) 639; *Shearer v. Pringle,* 203 Wis. 164, 233 N. W. 623. (See cases there referred to.)

Under the rules of law above outlined, our inquiry requires first a review or analysis of the evidence in the record of the proceedings at the house of the respondent Hess on the evening of May 26, 1947. It is there we see the dealings between the parties claimed to show that the minds of the parties met in actual agreement that appellant was to have the right to a three-year extension of the lease. There is, of course, a second or alternative inquiry which may arise out of the showing that the respondent knew before he delivered the lease to appellant of the existence of the mistake in the use of the word "lessor" instead of the word "lessee." If that conclusion should be reached, the result of the evidence bearing upon the phrasing of the lease would warrant the finding that an undue advantage was being sought by the respondent. Equity "will relieve as well against a fraud as against a mistake." *Dane v. Derber, supra,* page 220.

The evidence shows clearly that the subject of a three-year extension to the term of the lease was in the minds of both parties. The lease refers to an extension in its terms and by indorsement on the back. The respondent testified: "When they went to work and handed me this lease, I went through, you understand, and read it from one end to the other. And then I understand it, and I hand it back to him."

It is also certain that there were two different meetings at respondent's house on the evening of May 26, 1947. His lack of memory which occurred and reoccurred concerning the meetings and the discussions that took place is a matter to be weighed in judging the evidence. At the first meeting a lease which had previously been prepared was discussed. It is beyond question that that lease for some reason was not satisfactory. After that conclusion was reached, the appellant and the realtor, Mr. Scharel, left the house to go to the realtor's office to prepare another lease. The redrafted lease had in it burdens on the appellant, and a provision relating to the renewal was inserted. This particular provision contained the word "lessor" instead of "lessee." It is over the correctness of using that word "lessor" that this controversy arises. Was it intended to insert such an unusual provision giving the lessor the right to renew the lease; or was the real intention agreed upon by the parties to give an option of renewal to the lessee?

There is some testimony which might create confusion if the difficulties arising did not disappear when the transaction is studied in the light of the surrounding circumstances, and due weight is given to considerations which properly appear as moving or controlling factors. The trial court said:

"I am even prepared to make a finding to the extent that it was the desire of the plaintiff to have such renewal period; but such expression was not incorporated in the written contract which was prepared by the plaintiff's agent and submitted to the defendant for his consideration and which the defendant signed."

The respondent testified: "Well, I told him, you understand, that if everything was all right, you understand, that I would renew the lease. And on the lease, you know, that lease doesn't say I am going to renew it; but if he gave very satisfactory, I might have renewed it." The appellant first

appeared at respondent's house between seven and seven-thirty in the evening. The lease was not signed until about three hours later. There had been the redrafting of a lease. We cannot escape the conviction that one so determined to have the right of renewal would not have mentioned the subject, as respondent says is the case.

To show the confusion in the mind of the respondent upon this subject at the time of the trial, we point to statements in his testimony: "Well, I don't believe at any time, you understand, that we talked about an extension of lease." "The place was run in such miserable shape, you understand, that I couldn't continue to give him that lease." In reply to the question "Had you made arrangements with some other tenant then?" the respondent said, "I did." Again, he testified that on the night he signed the lease "there was not one word spoken about a lease or an extension of any kind, you know, when this thing was presented to me." However, in another portion of his testimony he said, with reference to the back of plaintiff's Exhibit 1 (lease), particularly as it refers to the term of the renewal option: "Well, I just merely seen the thing along the line; but I didn't make any remarks about it. . . . I naturally didn't make any remarks that I wanted to give him a renewal." Without determining the exact meaning and binding effect of the following statement, it is considered that it has evidential value tending to show that there was a discussion of an option and that the two sessions over the lease actually occurred at Mr. Hess's house in spite of his failure to recollect that there were two meetings, for he testified at one place as follows: "When they turned that lease over to me, you understand,—the law of the land,—you know the first thing it was that he was supposed to get a two-year lease; but when I got the copy it was marked 'three years.' And I said, Well, I don't object. I will give him a three-year lease. And I am satisfied to extend it to three years."

In his testimony the respondent also says that he inspected the basement around November 1, 1949, and that it was in such a condition that he decided not to renew the lease. The evidence of the response to the complaint about ashes in the basement appears consistent with the renewal right. The respondent said: "I know we were in the basement. . . . That is about six months before I gave him the notice. . . . It was filled full of ashes there. It wasn't clean. . . . That was the second time I went downstairs with him that I discovered the oil burner." So it appears that between the time of the complaint about the ashes and the next time the respondent visited the basement the appellant had, at the expense of some $300, converted the heating system to an oil burner. This item of expense, together with other disbursements required in the lease and set out in the statement of facts, is evidence which must be given serious consideration in determining the question now before us. In addition, there is testimony to the effect that the respondent in the summer of 1949 put concrete along in front of the garage, widening the size, and straightened out the doors. Respondent testified: "I put the place in good condition. . . . He must have been in there a little while already, and we fixed it up while he was in there." At the same time, in the summer of 1949, testimony shows that there was a conversation between Mr. Hess and La Rosa about adding a rear garage to plaintiff's place of business. Respondent's testimony is: "And I said if any time I should give up, you understand, my business, I would surely give him the right, you understand; that it would help him a good deal to have a bigger garage, you understand, to have an opening opened there." In another place he testified: "I said in time I would go to work and give him the benefit of it [referring to the rear garage]."

Testimony of other witnesses was to the following effect: William A. Goetz: "I am a qualified notary public of the

state of Wisconsin. I signed as a witness and notarized the lease in question. I arrived at Mr. Hess' house with Mr. Scharel. Mr. La Rosa and his brother were there and we walked in and they discussed having an extension and they had to go back to the office. . . . I was in the Hess home twice that night. The first time they went in and discussed about having that changed. Then Mr. Scharel and Mr. La Rosa went downtown to the office and I went out and sat in the car and waited until they came back. And then they called me in again and at that time I notarized it." Matthew Scharel, realtor: "Mr. La Rosa wanted a three-year lease with a three-year extension,—with an option of three-years extension. After the discussion of the option I left Mr. Hess' house with La Rosa to make out a new lease. I went to my office . . . and then I went back to Mr. Hess' house that night." Tony La Rosa: "The first lease brought by Mr. Scharel on May 26th had no option for an extension of any kind. The reason that that lease was changed was because there was so much that I had to put in the building. . . . When Mr. Scharel and myself left to redraw the lease we got back to the Hess house about ten o'clock."

From a careful consideration of the testimony of the witnesses we are of the opinion that the evidence which must be relied upon required findings to the effect that there was an understanding between the parties and a meeting of their minds as to the giving to the appellant the right to an extension of three years to the term of the lease. The respondent's recollection is at fault. His version that there was but one session of the parties over the lease at his house cannot be accepted as correct, nor can his recollection that nothing was said about an extension in favor of the appellant. Honest as he may be trying to be, his present understanding is not controlling. It is affected by an interest arising after the event which must be viewed in the light of his excusable failure of memory. It is evident that the true state of facts discloses

that there was such an agreement and that because of subsequent events the respondent desires to substitute another tenant. If a just reason for excluding the appellant from the premises exists it must be found under some other clause in the lease. When the lease is properly reformed, if just cause exists for charging the appellant with a breach of any of its stipulations or covenants, that issue may be framed and properly disposed of in a proceeding at law.

Just what would be the effect of the instrument as worded, giving the renewal privilege to the landlord? Whether those words were idle and meaningless or whether it would permit of a construction holding it to constitute a six-year lease with the right of termination for cause at the end of a three-year period need not be determined in this case.

The respondent urges, in his brief, that "assuming a lessee's option of renewal to have been agreed upon, the same was not incorporated into the lease, [and] is against the statute of frauds, and is unenforceable by reformation." We think that contention is disposed of by the statement of the rule at the beginning of this opinion.

It is considered, therefore, that the finding that there was no mutual mistake with respect to the lease providing for an extension in favor of the lessor is against the great weight and clear preponderance of the evidence; that the lease is subject to reformation giving to the appellant the option to renew the same under the terms thereof as so reformed.

*By the Court.*—Judgment reversed. Cause remanded with directions to reinstate the plaintiff's complaint and grant judgment in accordance with this opinion.