NEWMISTER, Respondent, v. CARMICHAEL and others, Appellants.

*January 4—February 1, 1966.*

For the appellants there was a brief by *Vaudreuil & Vaudreuil* of Kenosha, and oral argument by *Leo E. Vaudreuil.*

For the respondent there was a brief by *McEvoy & Munger* of Kenosha, and oral argument by *John P. McEvoy.*

CURRIE, C. J. Plaintiff tried this case on the theory that by mutual mistake 7½ percent had been inserted in several places in the written agreement of May 31, 1961, instead of the 15 percent previously agreed upon by the parties. Inasmuch as the judgment of reformation is grounded upon the trial court's finding that such mutual mistake had occurred, the crucial issue on this appeal is whether such finding is against the great weight and clear preponderance of the evidence, keeping in mind the applicable rule of burden of proof which rests upon the plaintiff in a reformation action.

Before recounting the material evidence we deem it advisable to state the following well-recognized rules of law here applicable. A mutual mistake by the parties to a contract is grounds for reforming it to conform to the

true intention of the parties.[1] However, this mutual mistake must be established by clear, convincing evidence that both parties intended to make a different instrument than the one signed and both agreed on facts different than those set forth in the instrument.[2] Parol evidence is admissible to establish mutual mistake in a reformation action.[3] Thus it is not a valid objection to interpose to the offer of such evidence that it tends to vary the terms of the written instrument sought to be reformed.

In the will contest counsel for the objector Mrs. Newmister were Attorneys David L. Phillips and Charles Richards of Kenosha, and Walter A. Yoder of Bloomington, Illinois. Carmichael and Mrs. Rigney were represented by former Circuit Judge ALFRED L. DRURY. While the bank was the original proponent of the will, Carmichael and Mrs. Rigney were accorded the status of proponents throughout the will contest. Attorney Leo E. Vaudreuil was present in court during the trial and testified for the proponents, and later after the will contest was concluded and the will admitted, his law firm of Vaudreuil and Vaudreuil were counsel for the executor bank pursuant to a request to such effect contained in

[1] *Clark v. Moru* (1963), 19 Wis. (2d) 503, 506, 120 N. W. (2d) 888; *Findorff v. Findorff* (1958), 3 Wis. (2d) 215, 224, 88 N. W. (2d) 327; *Langer v. Stegerwald Lumber Co.* (1952), 262 Wis. 383, 391a, 55 N. W. (2d) 389, 56 N. W. (2d) 512.

[2] *Holton State Bank v. Greater Milwaukee Food Merchants Asso.* (1960), 9 Wis. (2d) 95, 99, 100 N. W. (2d) 322, 79 A. L. R. (2d) 1176; *La Rosa v. Hess* (1951), 258 Wis. 557, 559, 560, 46 N. W. (2d) 737; *Kadow v. Aluminum Specialty Co.* (1948), 253 Wis. 76, 78, 33 N. W. (2d) 236.

[3] *Badger Savings Building & Loan Asso. v. Mutual Building & Savings Asso.* (1939), 230 Wis. 145, 152, 283 N. W. 466; *Reed v. Harvey* (1961), 253 Iowa 10, 22, 110 N. W. (2d) 442; *Smith v. Bear* (2d Cir. 1956), 237 Fed. (2d) 79, 86, 60 A. L. R. (2d) 1119; Restatement, 1 Contracts, p. 333, sec. 238 (c); 3 Corbin, Contracts, p. 431, sec. 580.

the will. However, Mr. Vaudreuil did not participate as counsel during the will-contest trial.

On the afternoon of Thursday, April 27, 1961, after several days of trial, the objector rested and the proponents moved to dismiss the objections. This motion was denied, the trial judge stating that the evidence "raises a grave question with respect to the testamentary capacity of the testatrix." Discussions of settlement then took place after adjournment of court that day between Phillips and Drury in the presence of Yoder and Richards, and an agreement was reached subject to approval of their respective clients.

Phillips' testimony as to what took place in these negotiations on April 27, 1961, is as follows: He asked Drury whether the case could not be settled, and the latter replied, ". . . we are interested. What do you want?" Phillips then stated that Mrs. Newmister's chances in the will contest were fifty-fifty, and, if successful, she would receive one third of the estate under the prior will. Since the chances were fifty-fifty, Mrs. Newmister would take half of a third or "16½ percent" (actually 16⅔ percent). Drury then said, "We can't pay 16½ percent. We will pay 15 percent, if it is satisfactory to my clients." Drury withdrew to confer with Mrs. Rigney and later returned. He then stated some additional terms such as Mrs. Newmister withdrawing her objections to the will and a claim she had filed against the estate. Drury also stated that Mrs. Newmister would get the 15 percent but it would have to be on the net estate after payment of taxes, claims, and all administration expenses and attorney fees. Phillips agreed to all the conditions stated by Drury. The next morning a further conversation was had with Drury in the courtroom in which he imposed one further condition with respect to the settlement, which was to exclude a piece of real estate in Indiana. To this Phillips agreed.

Both Yoder and Richards by their testimony corroborated that of Phillips. Drury did not deny Phillips' tes-

timony but stated, "What you don't remember, you can't deny." However, he testified that he thought the written agreement of May 31, 1961, was in accord with what had been agreed upon in the preceding verbal negotiations, and he could not remember any discussion of a figure of 15 percent.

It is undisputed that on the evening of April 27, 1961, Drury consulted with his two clients at the Vaudreuil home and informed them of the settlement verbally negotiated between counsel that afternoon subject to their approval. There is, however, a dispute in the testimony as to whether the terms of the settlement which he then stated to his clients were in accord with the terms as stated in Phillips' testimony. Vaudreuil was present and voiced opposition to the settlement. Carmichael and Mrs. Rigney approved the settlement as outlined by Drury subject to the further condition which he communicated to Phillips the next morning and was agreed to by Phillips.

Carmichael testified that he never had any information he had agreed to the 15 percent figure, and that he had never given authority to any lawyer to enter into a contract providing for payment of 15 percent of his share of the estate. Mrs. Rigney testified as follows: She attended the conference held at the Vaudreuil home on the evening of April 27, 1961. Drury there explained the proposal of settlement suggested at the prior conference of the attorneys. She had never agreed to "give" 15 percent. However, these questions were asked her and she gave these answers thereto:

"Q. . . . Now, did Mr. Drury then explain everything to you? A. Yes, he did.
"Q. And you agreed to what had been talked about there, is that right? A. Yes."

Phillips drew up a rough draft of an agreement which he thought embodied the terms of settlement which had been agreed upon and submitted it to Drury and Vaud-

reuil at the latter's office sometime between May 2 and 7, 1961. Drury suggested some minor changes which Phillips agreed to. However, the main change there agreed to had to do with the Kenosha county farm so as to provide for the contingency of this farm not being sold within five years. Phillips then drew the agreement in the final form in which the parties later signed it. The material provisions thereof are as follows:

"1. That each of the parties of the first part [Carmichael and Mrs. Rigney] do hereby agree to pay to Goldie Newmister, the party of the second part, her heirs, executors, administrators or assigns, a sum of money equal to seven and one-half (7½%) percent of the net amount received by each of the parties of the first part as their respective distributive shares of the personal estate of Chrystal D. Paschen now being probated in the County Court for Kenosha County, Wisconsin. It is understood and agreed that the parties of the first part shall have the option of making said payment either in cash or in kind of the personal assets of the estate as distributed, or part cash or part in kind as aforesaid. . . .

"3. That in addition to the payment agreed to be made as set forth in paragraph designated 1, that each of the parties of the first part do hereby agree to pay to Goldie Newmister, the party of the second part, her heirs, executors, administrators or assigns, a sum of money equal to seven and one-half (7½%) percent of the net amount received by each of the parties of the first part from the sale of the one hundred sixty (160) acre farm located in the Township of Somers, Kenosha County, Wisconsin, and which farm is more particularly described in the inventory on file in the estate of Chrystal D. Paschen. . . . It is understood that if any of the buildings or improvements on said premises are destroyed or damaged during the five year period hereinafter mentioned, by fire or other casualty, any monies received from insurance proceeds and not used by the parties of the first part for rebuilding or repairs, within a reasonable time, shall be subject to payments of seven and one-half (7½%) percent by each of the parties of the first part to the party of the second part. . . .

"4. That in the event the farm described in paragraph designated 3 is not sold within a period of five (5) years from the date of this agreement, that each of the parties of the first part shall pay to the party of the second part, her heirs, executors, administrators or assigns, the sum of Four Thousand Five Hundred (4,500.00) Dollars in cash. . . .

"7. That for the purpose of implementing this agreement, the parties of the first part do hereby assign to the party of the second part, her heirs, executors, administrators, or assigns, out of their respective legacies from said Chrystal D. Paschen estate, an amount sufficient to make the payment to the party of the second part, her heirs, executors, administrators or assigns, as set forth and defined in paragraph designated number 1 of this agreement and that the Kenosha National Bank, or its successors, as executors or administrators of the estate of Chrystal D. Paschen are hereby authorized to make the designated payment at the time when the same is due and payable, to accept receipts for the same, and to be relieved of any and all liability for the exercise of its function in this regard."

Phillips sent the original and six copies to Mrs. New-mister for signature. After she signed them he turned them over to Vaudreuil and he mailed them to Carmichael and Mrs. Rigney, who resided in Indiana and Arizona, respectively. They signed and returned them. The May 31st date is in Vaudreuil's writing, and apparently he inserted this date after the parties had affixed their signatures.

In February and March, 1963, the executor bank, upon directions of Vaudreuil acting as counsel for the executor, made certain transfers of corporate stocks constituting assets of the Paschen estate. There were three of these transfers but, as all were handled alike, we deem it sufficient to describe only that of the 2,400 shares of American Telephone & Telegraph Company stock. The bank sent the certificates for these shares into the company and had new certificates issued as follows:

"One certificate of 1,020 shares to Oden B. Carmichael
"One certificate of   180 shares to Oden B. Carmichael
"One certificate of 1,020 shares to Bessie E. Rigney
"One certificate of   180 shares to Bessie E. Rigney"

The certificates were issued thusly so that stock powers could be mailed to Carmichael and Mrs. Rigney and signed by them covering the two 180-share certificates in order to effectuate their assignment to Mrs. Newmister. The significant fact to be noted is that the 360 shares Mrs. Newmister was thus to receive are 15 percent, not 7½ percent, of the original 2,400 shares.

On March 15, 1963, Phillips drew up a memorandum addressed to Vaudreuil in which he outlined how Mrs. Newmister was to receive 15 percent of certain estate securities and of the cash balance in the estate. The commencing words of this memorandum were, "As we interpret the agreement of May 31, 1961, . . ." Phillips then handed Vaudreuil this memorandum at the bank in a conference also attended by the assistant trust officer in charge of the estate. Vaudreuil accepted the memorandum and said nothing to indicate that he disagreed with it.

Sometime in May, 1963, Phillips called Vaudreuil on the telephone and inquired as to when "we were going to close this thing out and transfer the stock and cash." Phillips' testimony as to what then transpired is as follows:

"He [Vaudreuil] said what do you think your client is entitled to, and I said she is entitled to 15%, including the farm in Kenosha that was sold and Leo said to me, how do you figure? And I said, Leo, why it is in the agreement. She is to get 7½% from Bessie and 7½% from Oden, and 7½ and 7½ makes 15% and Leo said where does it say that and I said in the Agreement. Leo said, I thought so too until I figured it out on paper and I said what do you mean? It says 15%. Leo said, I thought so too until I figured it out on paper and then he started to explain. Then I said to Leo, meet me at the bank and that I didn't understand this at all and he said sure. So

a few minutes later we met at the bank. I said, Leo, I just don't understand this at all. 7½ and 7½ makes 15. Then Mr. Vaudreuil said, let me show you something. He got out a scrap of paper and put down some figures and that was the first I realized that 7½ and 7½ didn't always make 15."

Even though in a reformation action the burden is upon the plaintiff to prove mutual mistake by clear and convincing evidence, we have no difficulty in concluding that the trial court's finding that such mutual mistake did occur is not against the great weight and clear preponderance of the testimony. In those instances in which conflict occurred in the testimony it was the province of the trial court to determine credibility.

We start with the premise that Phillips' testimony was true, because the trial court so determined. This determination is clearly evidenced by the following statement in the trial court's memorandum decision:

"It is extremely hard for any person, and that specifically includes lawyers or judges, to openly admit a glaring error which can be viewed by clients and the public. However, David L. Phillips, attorney openly and under oath testified he made a mathematical error when he placed seven and one-half percent in the contract for each and believed that seven and one-half percent and seven and one-half percent would make fifteen percent which he later found not to be true, all to his shock and chagrin.

"I must admit that I was impressed by this testimony and concluded that he was a lawyer of character and integrity. . . ."

Phillips' testimony clearly establishes that the verbal settlement agreement reached between him and Drury provided for Mrs. Newmister's receiving 15 percent of the net personal estate of the deceased and of the proceeds of the sale of the Kenosha county farm if it were sold within the five-year period. In negotiating this settlement Drury made it clear that he was doing so subject to the approval of his clients, Carmichael and

Mrs. Rigney. Crucial to a finding of mutual mistake on the part of the latter is the existence of clear and convincing evidence that they were advised by Drury of the 15 percent negotiated settlement. There are several pieces of evidence which tend to establish that Carmichael and Mrs. Rigney were advised by Drury of the terms of the 15 percent settlement negotiated between the attorneys, before they gave their verbal approval thereto.

There is Drury's testimony that he did advise Carmichael and Mrs. Rigney of the terms of the negotiated settlement. While it is true that he did not testify that he mentioned the figure of 15 percent, there is circumstantial proof that he must have done so. This consists of Vaudreuil's later acts of interpretation, and in the provisions contained in the May 31, 1961, agreement with respect to the Kenosha county farm.

Vaudreuil was present on the evening of April 27, 1961, when Drury outlined the terms of the negotiated settlement to Carmichael and Mrs. Rigney. Vaudreuil's later actions as attorney for the executor establish that he understood Mrs. Newmister was to receive 15 percent of the net personal estate. This conduct consisted of (1) the directions he gave to the executor bank in transferring securities, and (2) his silent acquiescence in the memorandum showing how the estate was to be distributed, handed to him by Phillips on or about March 15, 1963. Appellants contend this evidence was improperly received because Vaudreuil did not act as counsel for appellants at the time the settlement was negotiated, and, therefore, his acts cannot bind appellants. We deem this evidence was properly admitted as evidencing the interpretation which a person present at the conference between Drury, Carmichael, and Mrs. Rigney placed upon what was there said and decided. Vaudreuil would have been a competent witness to have testified to what there transpired. For the same reason we determine his

acts of interpretation were admissible as having probative value.[4] We cannot conceive of him so acting if a figure for settlement of less than 15 percent had been discussed and agreed upon at the April 27, 1961, conference.

We turn now to the provisions in the May 31, 1961, agreement with respect to the Kenosha county farm. Under these provisions, if the farm were not sold within five years, the appellants Carmichael and Mrs. Rigney were to each pay Mrs. Newmister $4,500, or $9,000 in all. Phillips testified that in the settlement negotiations with respect to this he expressed the view that the $75,000 appraised value of this farm was high, that the true value was $60,000, and that the $9,000 was arrived at on the basis of 15 percent of $60,000. Furthermore, it was provided that if any of the farm buildings or improvements should be destroyed by fire, or other casualty, during the five-year period, each appellant was to pay to Mrs. Newmister 7½ percent of any insurance proceeds not utilized for replacement. As so worded Mrs. Newmister would have received a total of 15 percent of such unused insurance proceeds. These provisions are wholly inconsistent with appellants' position.

It is immaterial that some of this evidence which is relied upon to establish that appellants knew of the 15 percent negotiated settlement and had agreed thereto at the April 27, 1961, conference, is circumstantial. In *Kadow v. Aluminum Specialty Co.*[5] this court stated:

"It is argued that testimony of parties, equally credible, does not support reformation. *Sable v. Maloney* (1880), 48 Wis. 331, 4 N. W. 479. This does not prevent reformation being established by evidence of circumstances and the nature of the transaction and the conduct

---

[4] For the reasons why evidence of conduct such as this should be admissible, see Falknor, The "Hear-Say Rule" as a "See-Do Rule," 33 Rocky Mountain Law Review (1961), 133.

[5] (1948), 253 Wis. 76, 78, 33 N. W. (2d) 236.

of the parties in relation thereto, provided the natural and reasonable inferences to be drawn therefrom clearly and decidedly prove the alleged mistake. *Sable v. Maloney, supra; Geib v. Reynolds* (1886), 35 Minn. 331, 28 N. W. 923; *Layman v. Minneapolis Realty Co.* (1895), 60 Minn. 136, 62 N. W. 113; 53 C. J., Reformation of Instruments, p. 1037, sec. 202."

*By the Court.*—Judgment affirmed.