HAJEC, Respondent, v. NOVITZKE and another, Appellants.

*No. 95. Argued March 3, 1970.—Decided March 31, 1970.*
(Also reported in 175 N. W. 2d 193.)

404

406

408

For the appellants there was a brief by *Krueger & Thums* of Wausau, and oral argument by *William F. Krueger.*

For the respondent there was a brief by *Tinkham, Smith, Bliss & Patterson* of Wausau, and oral argument by *C. Duane Patterson.*

WILKIE, J. On defendants' appeal three issues are presented:

1. Is the trial court's finding that the deed from Lang and Novitzke of April 22, 1965, conveyed to Hajec the portion of the property on which the well and trees which Hajec subsequently cut were located not against the great weight and clear preponderance of the evidence?

2. Did Lang and Novitzke establish that they were entitled to reformation of the deed?

3. Did Novitzke have probable cause to sign the complaint against Hajec?

## *Where was the westerly boundary?*

It is clear that Lang and Novitzke intended to convey to Hajec the property described in the deed. What is not so clear is whether the parties knew where the westerly boundary of that description was. Neither Hajec nor Lang nor Novitzke had the property surveyed prior to the execution of the deed. Only after Hajec was charged with timber trespass following his entry on the property to cut trees did he hire Leonard Lampert to do a survey to determine the western boundary line of his property. Lampert's survey indicated that the western boundary line was approximately five feet west of the well. Under this survey the well and the trees were all on the land deeded to Hajec.

On the other hand, the defendants waited until after the malicious prosecution action was started against them and shortly before the court trial on that dispute and over the location of the westerly boundary line to hire Reuben Davel, also a registered land surveyor, to establish the disputed western boundary line. Davel did not make a complete survey of the property involved in this dispute, but he did attempt to establish where the western boundary line would be. His conclusion flatly contradicted Lampert's. Davel indicated that if the stone fence line were extended south, as Lang and Novitzke claim the agreement called for, the well would be 27 feet, three inches west of this line. In other words, the well clearly would be on Lang's and Novitzke's property. In addition, Davel determined that if the western boundary line were established according to the original government notes, it would be approximately nine inches east of the well. Thus, the well and trees would still be on Lang's and Novitzke's property.

Since the deed, as drafted by Lang's and Novitzke's attorney, did not qualify the description of the property by incorporating the alleged agreement that the western boundary of the parcel would be the extension of the stone fence line southerly, it must be assumed that the parcel conveyed was to include all within the description as stated. When there is a deficiency in a description contained in a deed, it is construed against the party who drafted it.[2]

The exact location of the western boundary line is a factual determination. In adopting its findings on this point, the trial court had to choose between the Lampert and Davel surveys. He chose to rely on the Lampert survey and his testimony.

---

[2] See *Lintner v. Office Supply Co., Inc.* (1928), 196 Wis. 36, 42, 219 N. W. 420.

Lampert is an eminently qualified land surveyor with much experience. In making the survey involved in this case, Lampert employed the dependent retracement technique as set forth in the United States Department of Interior publication, *Manual of Instructions for the Survey of Public Land.*

In conducting his survey, Lampert studied the original field notes which were recorded and showed that the section was surveyed and monumented by posts in 1853. Lampert found a stone marker at the intersection of county trunk highways C and X at the northwest corner of section 30. Although this was not the original monument since it was a stone, not a post, Lampert concluded that it could be considered as properly located since it was part of the range line between two towns. Lampert and his crew were unable to locate a monument at the northeast corner of the section. Residents of the area told the crew that the stone at the northeast corner had been moved as had the location of the town road running along the east side of section 30.

Since this corner was lost, Lampert used a procedure for resetting lost corners as set forth in the Department of Interior publication. By this method, called the single proportionate measurement method, two fixed points are located and the distance between them measured. This distance is then compared with the distance shown on the original survey notes and a ratio is determined. The overage or shortage is then apportioned over the whole line between the two points.

Lampert used the northwest cornerstone as one point and chose, as the other, the point where the Eau Claire river crossed the north line of section 28, about two and one-half miles east of the northwest cornerstone. According to Lampert, these two points were 114 feet closer together at the time of the survey as compared to the original 1853 field notes. This variation in distances is not unusual since today's instruments are more accurate.

The 114 feet were apportioned over the entire two and one-half miles between these points to determine the position of the western boundary line of the property in dispute. This necessarily pushed the westerly boundary farther west than if marked by the stone fence on the Hajec property in section 19.

In opposition to this survey, Lang and Novitzke hired Davel to establish the western boundary line. Davel, also highly qualified as a surveyor and with previous experience, admittedly did not make a complete survey. He also used the stone at the northwest corner of section 30 as a starting point. But instead of going to the Eau Claire river as the other point, he used a stone marker allegedly located at the quarter line of section 29. This corner he took to be approximately one-half mile east of the northeast corner of section 30. He measured from west to east and also found a variation between the present measurement of section 30 and the original field note measurement of 59 feet. Thus by using Davel's method there would be an overage of 59 feet in section 30 and a shortage of 165 feet in the next section. The trial court apparently viewed this extra 59 feet as a factor diminishing the reliability of Davel's survey.

In his brief, the respondent points out other internal weaknesses in the method employed by Davel: Davel used the cement marker at the quarter line of adjoining section 29, yet there was no testimony this was a survey marker. It was not the original monument since it was a cement marker and not a post, and concrete was not used for markers until after 1910.

Similarly, Davel assumed that the northeast corner of section 30 was the center of the intersection between county highway C and the town road, yet no corner marker was found. The only proof that this was the case was that the road was there. However, roads are not always on section lines.

We need go no further. The point is clear. The trial court was justified in relying on the Lampert survey as establishing the boundary line. Such reliance was not against the great weight and clear preponderance of the evidence.

### Mutual mistake.

Lang and Novitzke contend that they are entitled to reformation of the deed based on mutual mistake. They contend that they thought they were conveying only the property included east of the extension of Hajec's stone fence line and that the well was not included. However, Hajec testified, albeit self-servingly, that prior to the closing he informed Lang and Novitzke that the well was on his side.

Thus, while the mistake might have been mutual as between Lang and Novitzke, it does not appear to be mutual as between the parties. Any mistake appears to have been unilateral.

The cases cited by Lang and Novitzke to support their claim of mutual mistake can be distinguished from the instant situation. In *Fuchs v. Treat*,[3] the plaintiff brought an ejectment action upon discovering that defendant's warehouse was partially on the property the defendant had previously conveyed to plaintiff. There the mistake was clearly mutual. The plaintiff even admitted that at the time he bought the land, he did not think he was buying land upon which the warehouse stood. This is not the case here. Hajec does not admit that he thought that he would not get the well. Similarly, in *Schultz v. Rudie*,[4] the boundaries were pointed out prior to sale by the vendor's agent. The agreement was

---

[3] (1877), 41 Wis. 404.
[4] (1957), 275 Wis. 99, 80 N. W. 2d 804.

made and then it was discovered that the boundaries were not as assumed. This court held that the purchaser was entitled to have the deed reformed so as to correspond to such description. That was a mutual mistake. Here Hajec claims he knew he was getting exactly what the legal description said, including the well.

Likewise, in *Cordes v. Coates*,[5] the mutual mistake lay in the fact that both parties thought the farm boundary was the section line. This is not true here. Lang and Novitzke thought the boundary would be an extension of the Hajec's stone fence line. Hajec contends that he knew his boundary line was farther west and that he told Lang and Novitzke that.

The party seeking reformation has the burden to prove mutual mistake by clear and convincing evidence.[6]

Where the testimony of both parties is equally credible and is in direct conflict, as here, and "there [is] no other direct evidence nor any surrounding circumstances in corroboration of the testimony of the grantor,"[7] reformation cannot be obtained. Cases cited by the appellants for the proposition that reformation will be decreed where there is a mistake on one side and fraud on the other,[8] are not in point since there is no question here of fraud on Hajec's part.

The trial court found that there was no mutual mistake and that property conveyed was the same as that described in the deed. Nevertheless, the trial court gave Lang and Novitzke an easement for the use of the well.

[5] (1891), 78 Wis. 641, 47 N. W. 949.

[6] *Newmister v. Carmichael* (1966), 29 Wis. 2d 573, 139 N. W. 2d 572.

[7] *Sable v. Maloney* (1880), 48 Wis. 331, 334, 4 N. W. 479; see also *Kadow v. Aluminum Specialty Co.* (1948), 253 Wis. 76, 33 N. W. 2d 236.

[8] *Findorff v. Findorff* (1958), 3 Wis. 2d 215, 224, 88 N. W. 2d 327; *Langer v. Stegerwald Lumber Co.* (1952), 262 Wis. 383, 391a, 55 N. W. 2d 389, 56 N. W. 2d 512.

Since Hajec concedes there is evidence to support this finding, it is not necessary to review it.

## Malicious prosecution.

The specific elements necessary to establish a cause of action for malicious prosecution are well established.[9] In the instant case, as is usual,[10] the most hotly contested elements are lack of probable cause and malice.

This court, in discussing the quantum of evidence necessary to a determination that a private party had "probable cause" to believe that another person committed a crime, has said:

". . . We are not concerned with the state of mind of a 'prosecutor' of 'ordinary caution and prudence;' rather we are concerned with the quantum of evidence that would lead an ordinary and reasonable layman in the circumstances, to believe that the plaintiff committed a crime. . . ." [11]

This court has held that where, as here, a defendant in a criminal prosecution is discharged, that is prima facie evidence of want of probable cause.[12] So here, there is a prima facie showing of lack of probable cause.

However, this situation has been met by this court before. In *Neumann v. Industrial Sound Engineering, Inc.*,[13] this court said:

---

[9] See *Elmer v. Chicago & N. W. Ry.* (1950), 257 Wis. 228, 231, 43 N. W. 2d 244; *Pollock v. Vilter Mfg. Corp.* (1964), 23 Wis. 2d 29, 126 N. W. 2d 602. See also *Gladfelter v. Doemel* (1958), 2 Wis. 2d 635, 87 N. W. 2d 490.

[10] See generally, *Yelk v. Seefeldt* (1967), 35 Wis. 2d 271, 151 N. W. 2d 4; *Schaefer v. Hayes* (1966), 30 Wis. 2d 424, 141 N. W. 2d 210.

[11] *Pollock v. Vilter Mfg. Corp.*, supra, footnote 9, at page 41, 42.

[12] *Bigelow v. Sickles* (1891), 80 Wis. 98, 49 N. W. 106; *but see Eggett v. Allen* (1903), 119 Wis. 625, 96 N. W. 803.

[13] (1966), 31 Wis. 2d 471, 143 N. W. 2d 543.

"In *Brinsley v. Schulz* (1905), 124 Wis. 426, 102 N. W. 913, this court pointed out one of the most efficient ways of negating a *prima facie* showing of lack of probable cause was to prove the action was brought upon advice of counsel, particularly by a proper prosecuting officer if the action was a criminal matter, *after a full statement to him of all the facts known to the defendant.* The ultimate truth of the facts is not as important as an honest belief in the existence of the facts and a fair and full statement of them to counsel in order to obtain guidance in the matter. A full and fair statement of all the facts does not mean all the facts discoverable as contended by the appellant but all the facts within the knowledge of the person making the statement. *King v. Apple River Power Co.* (1907), 131 Wis. 575, 111 N. W. 668. This knowledge may be either founded on personal observation or upon credible information. It is for counsel to evaluate the weight and sufficiency of the facts and the advice of a reputable counsel in such cases, even if ultimately proved wrong, supplies the defense to lack of probable cause. . . ." (Emphasis added.) [14]

In the instant case, Lang and Novitzke upon discovering that Hajec was cutting trees contacted their lawyer. Upon that lawyer's advice they contacted the district attorney who issued the summons. Hajec claims there was not a full and fair disclosure of the facts either to the private attorney or to the Marathon county district attorney, thus this defense is not available to Lang and Novitzke.

We disagree. Both sides were operating under competing claims to the property. Lang and Novitzke had made an informal survey from which they concluded the well and the trees were on their property. There is testimony that Hajec, at a time shortly after purchase, acquiesced in Lang's placement of the boundary so that the well (and the trees) were not conveyed. This coupled with the fact that Hajec had exercised no control over the well (or the trees), although he had been in possession of the property

---

[14] *Id.* at page 478.

for over a year, makes it reasonable to assume that Lang and Novitzke honestly believed this land to be theirs. There is nothing in the record which would indicate that they made a less than candid report to their attorney. It was upon his advice and the advice of the district attorney that Novitzke swore out the complaint. Although the district attorney failed to make a full investigation into the facts before issuing the summons,[15] the plat book was considered by him in reaching his decision.

The fact that the defendants acted on the advice of their attorney after a full and fair disclosure to him, and that the district attorney, by later issuing the summons, put his imprimatur on the proceedings, leads to the conclusion that the defendants had probable cause, as a matter of law, for their actions. Thus, the defendants are insulated from liability for malicious prosecution because one of the essential elements—lack of probable cause—was missing.[16]

One issue is presented by plaintiff's motion to review:

Is the award of only $1 to Hajec adequate for trespass on his property by Lang and Novitzke?

Hajec may properly raise the issue of the adequacy of this award by his motion for review.[17]

Where the plaintiffs have proved no actual damage, a nominal award for damages is proper.[18] Hajec claims that the award is in error because the trial court failed to recognize that the trespass giving rise to the primary element of his damage is that he was deprived of the proper use of the land he purchased because the de-

[15] *See generally, Smith v. Federal Rubber Co.* (1920), 170 Wis. 497, 175 N. W. 808.

[16] *See Gladfelter v. Doemel, supra,* footnote 9.

[17] *Plesko v. Milwaukee* (1963), 19 Wis. 2d 210, 220, 120 N. W. 2d 130.

[18] *See Sunderman v. Warnken* (1947), 251 Wis. 471, 29 N. W. 2d 496.

fendants would not help build a fence as they were required.

However, two witnesses, Beggs and Morris, both testified in effect that Hajec was in no hurry to fence in the land as he did not intend to use it until later in the year for pasture. In view of this testimony and since there was no actual injury to the land,[19] the trial court was justified in awarding only nominal damages of $1 for this trespass. The damages which plaintiff seeks are highly speculative in nature. Damages must be proved with reasonable certainty and may not be based on conjecture.[20]

*By the Court.*—Judgment affirmed as to location of westerly boundary line, denial of defendants' counterclaim, and as to award to plaintiff for defendants' trespass; judgment reversed as to finding of malicious prosecution and award therefor; no costs awarded on this appeal.

---

[19] *See McKinnon v. Benedict* (1968), 38 Wis. 2d 607, 625, 157 N. W. 2d 665.

[20] *See Novo Industrial Corp. v. Nissen* (1966), 30 Wis. 2d 123, 140 N. W. 2d 280.