POLLOCK, Appellant, v. VILTER MANUFACTURING CORPORATION and another, Respondents.

*February 6—March 3, 1964.*

32

34

For the appellant there was a brief by *Charles F. Higgins* and *William H. Bowman,* both of Milwaukee, and oral argument by *Mr. Bowman.*

For the respondents there was a brief by *Whyte, Hirschboeck, Minahan, Harding & Harland* and *Reginald W. Nelson,* all of Milwaukee, and oral argument by *Mr. Nelson.*

WILKIE, J.   The issues raised in this appeal are:

1. In the circumstances of this case, was the federal prosecution of Pollock for violation of 18 U. S. Code, sec. 2314, commenced by or at the instance of Vilter?

2. Assuming that the prosecution was commenced at the instance of Vilter, did management representatives have probable cause to believe that Pollock had committed a business crime?

Issue 1. *In the circumstances of this case, was the federal prosecution of Pollock for violation of 18 U. S. Code, sec. 2314, commenced by or at the instance of Vilter?* The elements of the cause of action seek to limit its application to those instances in which the defendant, as a private citizen, has taken affirmative, decisive steps to subject another person to the rigors of a lawsuit, without knowing that his claim is well grounded; and being motivated, not by a desire to vindicate his legitimate legal interests or the interests of the community, but rather by a desire to injure the reputa-

tion, or economic interests of the plaintiff. The specific elements of a cause of action for malicious prosecution are:

"1. There must have been a prior institution or continuation of some regular judicial proceedings against the plaintiff in this action for malicious prosecution.

"2. Such former proceedings must have been by, or at the instance of, the defendant in this action for malicious prosecution.

"3. The former proceedings must have terminated in favor of the defendant therein, the plaintiff in the action for malicious prosecution.

"4. There must have been malice in instituting the former proceedings.

"5. There must have been want of probable cause for the institution of the former proceedings.

"6. There must have been injury or damage resulting to the plaintiff from the former proceedings." [3]

In the instant case, the uncontradicted allegations of the affidavit must lead to the conclusion that the prosecution of Pollock was not initiated or sustained "by, or at the instance of" Vilter.

We have noted that in February, 1962, Vilter management presented certain information concerning Pollock's activities in relation to MEC, a dummy corporation, to the United States attorney for the Eastern district of Wisconsin, and to an agent of the FBI. Thereafter, the FBI, on its own initiative, conducted further investigations concerning Pollock's transactions with MEC and Bernard in his role as a Vilter vice-president.

After the completion of this additional investigation, FBI Agent Weinberg concluded that he had reason to believe that Pollock had committed a federal business crime—violation of 18 U. S. Code, sec. 2314.[4] Weinberg signed that complaint upon which the arrest warrant was predicated.

[3] *Elmer v. Chicago & N. W. R. Co., supra,* p. 231.
[4] *Supra,* footnote 1.

A United States commissioner obviously believed that the factual allegations of the arrest warrant demonstrated probable cause to believe that Pollock had committed a crime, because he issued the warrant.[5]

The United States attorney shared Weinberg's view of the matter because he sought an indictment from the grand jury. The grand jury, in turn, found probable cause to believe that Pollock violated 18 U. S. Code, sec. 2314.

Moreover, the trial judge denied defendant's motion for acquittal, thus indicating his belief that reasonable men

---

[5] 18 USCA, Fed. Rules Cr. Proc., p. 108, Rule 3: "The complaint is a written statement of the essential facts constituting the offense charged. It shall be made upon oath before a commissioner or other officer empowered to commit persons charged with offenses against the United States."

18 USCA, Fed. Rules Cr. Proc., p. 110, Rule 4: "(a) . . . If it appears from the complaint that there is probable cause to believe that an offense has been committed and that the defendant has committed it, a warrant for the arrest of the defendant shall issue to any officer authorized by law to execute it. . . ."

*Giordenello v. United States* (1958), 357 U. S. 480, 485, 78 Sup. Ct. 1245, 2 L. Ed. (2d) 1503. "Criminal Rules 3 and 4 provide that an arrest warrant shall be issued only upon a written and sworn complaint (1) setting forth 'the essential facts constituting the offense charged,' and (2) showing 'that there is probable cause to believe that [such] an offense has been committed and that the defendant has committed it. . . .' The provisions of these Rules must be read in light of the constitutional requirements they implement. The language of the Fourth Amendment, that '. . . no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the persons or things to be seized,' of course applies to arrest as well as search warrants. See *Ex parte Burford,* 3 Cranch 448; *McGrain v. Daugherty,* 273 U. S. 135, 154–157. The protection afforded by these Rules, when they are viewed against their constitutional background, is that the inferences from the facts which lead to the complaint '. . . be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.' *Johnson v. United States,* 333 U. S. 10, 14. The purpose of the complaint, then, is to enable the appropriate magistrate, here a Commissioner, to determine whether the 'probable cause' re-

could find the defendant guilty beyond a reasonable doubt.[6] Pollock's movement through the stages of the criminal process halted with the jury verdict of acquittal.

Clearly, the decision to prosecute was an independent choice of government agents, and the movement of the criminal process up to acquittal resulted from further independent decisions made by the appropriate government officials in their official capacities.

The only course of conduct by Vilter management that is relevant to a claim of malicious prosecution is their decision to present certain information to the United States attorney and the FBI in February, 1962, prior to the official commencement of criminal proceedings. Silverman's appearance before the grand jury was under subpoena. At that time, the government had independently committed itself to the prosecution. *A fortiori,* when Silverman appeared as a witness for the prosecution on the trial, the government had made an irreversible decision to prosecute.

It is clear that the decision to *commence* criminal proceedings against Pollock, such decision being evidenced by FBI Agent Weinberg's signing of a complaint in support of an arrest warrant, was not solely predicated upon the information supplied by Vilter management.

The mere fact that a person other than a member of Vilter management signed the complaint in support of the arrest warrant does not in and of itself preclude liability for Vilter. We note that it is common practice in the federal criminal system, and in the state system as well, for a police officer to be the complaining witness. Although, in the federal system

---

quired to support a warrant exists. The Commissioner must judge for himself the persuasiveness of the facts relied on by a complaining officer to show probable cause. He should not accept without question the complainant's mere conclusion that the person whose arrest is sought has committed a crime."

[6] *United States v. Feinberg* (2d Cir. 1944), 140 Fed. (2d) 592.

the officer must specifically allege the factual basis for his determination of probable cause, he may rely upon information and belief as the basis of such allegations.[7]  In the state system, an officer may simply allege his conclusion of probable cause based upon information and belief.[8]  Therefore, if an officer accepted groundless allegations made by a private party and signed a complaint supporting the warrant alleging information and belief as the basis of his conclusion, and if the magistrate, accepting the sufficiency of the allegations, issued a warrant, the plaintiff would be damaged as a result of defendant's initial false or inaccurate statements.  That an officer signed the original complaint does not alter defendant's liability under these circumstances.

However, in the instant case, FBI Agent Weinberg did not base his decision to sign the complaint solely upon the information provided by Vilter.  Rather, he conducted his own independent investigation for a period of two months, counseling both with other FBI agents and with the United States attorney, before seeking the arrest warrant.

Under these circumstances Vilter's conduct did not, as a matter of law, initiate the criminal prosecution of Pollock.

Pollock argues, however, that Vilter failed to make full disclosure of all the circumstances surrounding his transactions with MEC and that had Agent Weinberg been apprised of all material facts, he would not have sought an arrest warrant.  Specifically, Pollock argues that Vilter failed to disclose the fact that MEC returned to Vilter a sum of $250,000 during the period in question.  However, this fact was evidenced by the Wolf audit which Vilter turned over to Weinberg in the initial February meeting.  Weinberg alleged in his affidavit that he was well aware of these return transactions before he sought the warrant, but concluded that this fact did not alter Pollock's liability.  This allegation is not

---

[7] *Giordenello v. United States, supra.*

[8] *State v. Luczaj* (1960), 9 Wis. (2d) 199, 100 N. W. (2d) 368.

controverted. Moreover, Weinberg alleged that prior to seeking the warrant he offered Pollock an opportunity to explain the transactions. Pollock refused. Clearly, Vilter did not withhold or conceal information from Weinberg which might have affected his independent decision to commence the prosecution.

Issue 2. *Assuming that the prosecution was commenced at the instance of Vilter, did management representatives have probable cause to believe that Pollock had committed a business crime?* Although Pollock was ultimately acquitted of the charge under 18 U. S. Code, sec. 2314, in November, 1962, we must assess the basis of Vilter's belief that Pollock had committed a crime from Vilter's point of view in January and February, 1962.[9]

The quantum of evidence necessary to a determination that a private party had "probable cause" to believe that another person committed a crime is as follows:

" 'Probable cause' has been defined to be such a state of facts in the mind of the prosecutor as would lead a man of ordinary caution and prudence to believe or entertain an honest and strong suspicion that the person arrested is guilty. It is generally held that whether a defendant sued for malicious prosecution acted on probable cause is a mixed question of law and fact. Where the facts are in dispute, the jury determines the facts under proper instruction of the trial court, and the court determines the question of probable cause from such facts. Where the facts are undisputed, the question of probable cause is solely for the court." [10]

The test requires some clarification. We are not concerned with the state of mind of a "prosecutor" of "ordinary caution and prudence;" rather we are concerned with the quantum of evidence that would lead an ordinary and reasonable layman in the circumstances, to believe that the plaintiff committed a

[9] *Novick v. Becker* (1958), 4 Wis. (2d) 432, 90 N. W. (2d) 620.
[10] *Elmer v. Chicago & N. W. R. Co., supra,* footnote 2, p. 232. See also *De Vries v. Dye* (1936), 222 Wis. 501, 269 N. W. 270.

crime. A trained federal United States attorney might well conclude that certain complicated transactions, while clearly unethical, were not business crimes under complex federal law. However, a businessman, untrained in the law, may well feel that the other party was an "embezzler" in the sense that the term is used in everyday life, and legitimately report his suspicions to the police or prosecutor. Moreover, we may note, generally, that many kinds of antisocial behavior cannot be deemed "crimes" in the legal sense of that term. Yet this fact, while appreciated by those trained in the law, is often not perceived by intelligent laymen. It is unfair, therefore, to hold a layman to the same standard as a prosecutor, in evaluating whether he had "probable cause" to believe that another person committed a crime, and consequently presented his information to the prosecutor.

Therefore, in the context of a malicious-prosecution suit, "probable cause" shall mean that quantum of evidence which would lead a reasonable layman in the same circumstances to honestly suspect that another person had committed a crime. Certainly, Vilter management had evidence which would lead reasonable, responsible corporate executives to honestly suspect that Pollock had committed a business crime. The fact that the grand jury returned an indictment against Pollock is not conclusive evidence that Vilter had "probable cause" to suspect Pollock.[11] However, the fact of that official determination of "probable cause" by a judicial institution, when coupled with knowledge of the facts that Vilter presented to the FBI and the United States attorney, forecloses liability for Vilter.

1. Not only did Vilter management know that Pollock maintained a dummy corporation "doing business" with

---

[11] *Elmer v. Chicago & N. W. R. Co., supra,* footnote 2. A bind over at preliminary hearing, the equivalent institution of grand jury—not deemed *conclusive* evidence of "probable cause."

Vilter, but management also knew that Pollock deceived them about that fact.

2. Management knew that Pollock had altered invoices from Bernard, its shipper; had approved checks prepared in the light of the altered invoices for payment to Bernard; and had directed Bernard to transfer the "excess" generated by this technique to the account of his dummy corporation on Bernard's books.

3. Management knew that Pollock had caused Vilter's books to show lesser amounts to be due from various distributors than such distributors were billed; payments by the distributors of the greater amounts caused credits to be generated on Vilter's books on behalf of these distributors. Pollock then caused the credits to be removed from the accounts of various distributors and to be transferred to an account for MEC. Management knew that on one occasion, Vilter issued a check for $27,500 chargeable against the MEC account payable directly to MEC.

4. The Wolf audit, in management's possession prior to the meeting with the FBI and the United States attorney, revealed that in the years 1957 to 1960, inclusive, the aggregate amount which Vilter paid Bernard upon what purported to be *bona fide* freight bills exceeded the aggregate amount of actual bills sent by Bernard to Vilter by approximately $60,000. Moreover, the Wolf audit revealed that in the same period Pollock received $402,000, which amount came to Bernard in collections from Vilter and was credited to the account of MEC. Bernard issued checks against these accounts payable directly to Pollock in his own name or in the name of MEC in the amount of $147,000.

On these facts, in February, 1962, reasonable corporate executives had, as a matter of law, "probable cause" to believe that Pollock had committed *some* business crime, notwithstanding the return of $250,000 credits from MEC to Vilter, revealed by the audit, or Pollock's ultimate explana-

tion on the trial that he used these devices as a means of financing foreign distributors of Vilter products with a minimum of "corporate red tape."

The pleadings and affidavits do set forth allegations and denials constituting disputed facts as to the issue of malice in instituting the proceeding. If a trial of these disputed facts resulted in a finding entirely in favor of Pollock, he would not be entitled to judgment for the reason that there is no arguable dispute as to two essential elements of his cause of action as set forth above.

*By the Court.*—Judgment of the lower court, dismissing the complaint, is affirmed with costs. Defendant's motion for costs for printing in excess of forty pages is denied.

GORDON, J., took no part.