125 F.3d 408
 74 Fair Empl.Prac.Cas. (BNA) 1398,
71 Empl. Prac. Dec. P 44,957
Craig S. JOHNSON, Plaintiff-Appellant,
v.
HONDO, INCORPORATED, a foreign corporation, doing business
as Coca-Cola Bottling Company of Wisconsin,
Defendant-Appellee.
 No. 96-3492.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 16, 1997.
Decided Aug. 28, 1997.
 
 E. Campion Kersten (argued), Kersten & McKinnon, Milwaukee, WI, for Plaintiff-Appellant.
 Bradford L. Livingston, David J. Rowland (argued), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendant-Appellee.
 Before CUMMINGS, FLAUM and RIPPLE, Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 Plaintiff Craig Johnson filed this suit in the Circuit Court of Milwaukee County, Wisconsin, alleging, among other things, that Hondo, Incorporated, doing business as Coca-Cola Bottling Company of Wisconsin (hereafter "Coca-Cola"), was liable under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e et seq., for failing to put a stop to the sexual harassment by a male co-worker, Ollie Hicks, that he allegedly suffered while employed at Coca-Cola. Johnson's Title VII claim also charges that he was terminated in retaliation for complaining about the sexual harassment by Hicks. In addition to the Title VII claims (Count VI), Johnson alleged five state law causes of action: (1) malicious prosecution; (2) assault and battery; (3) intentional infliction of emotional distress; (4) invasion of privacy; and (5) negligent retention and supervision of Hicks. Coca-Cola removed the case to federal district court pursuant to 28 U.S.C. § 1441.
 
 
 2
 On August 24, 1995, Coca-Cola filed a motion to dismiss Johnson's common law tort claims (Counts I through V) and this motion was granted in January 1996. As to Count I for malicious prosecution, Judge Warren held that Johnson failed to allege adequate facts. As to Counts II-V, he held that the claims were barred by the exclusivity provision of the Wisconsin Worker's Compensation Act. (Plaintiff's App. 34-35).
 
 
 3
 In June 1996, Coca-Cola filed a motion for summary judgment on the Title VII claims in Count VI concerning the sexual harassment by co-worker Hicks, and Johnson's alleged suspension and discharge in retaliation for complaining about that harassment. Summary judgment was granted in favor of Coca-Cola in September 1996 (Plaintiff's App. 20). For the reasons that follow we affirm the judgment of the district court.
 
 FACTS
 
 4
 Johnson was employed by Coca-Cola from 1972 until his 1993 termination. At all times relevant to this litigation he worked as a second-shift "night loader." In addition to loading and unloading trucks, "night loaders" operate forklifts and arrange cases of Coca-Cola product on pallets according to customer orders. In 1988, Ollie Hicks was hired by Coca-Cola as a night loader and worked with Johnson. They worked in an all-male environment. Johnson claims that Hicks frequently told him "I am going to make you suck my dick" or some similar variant on this theme.[1] In return, Johnson called Hicks a "punk," "faggot," "fag" and "s.o.b."[2] Johnson also claims that Hicks made such comments to two other male co-workers. Furthermore, Johnson maintains that he and other workers repeatedly complained about Hicks' harassment to their supervisors and managers and asked them to stop it. Nevertheless Coca-Cola failed to conduct any meaningful investigation and ignored the complaints and ridiculed Johnson for his complaints.
 
 
 5
 In pertinent part, the district court summarized Johnson's showing as follows:
 
 
 6
 Johnson states Hicks persistently came up to him and would brush against him. Hicks would "grab and manipulate his crotch" and state "[g]onna [sic] get my dick sucked." (Johnson Aff. p 35.) Johnson's claim of sexual harassment consists of repeated comments by Hicks directed toward Johnson, for example, "I'm going to make you suck my dick." Hicks also made comments about Johnson's girlfriend, stating that he would have her "suck his dick because she's got a nice ass." (Johnson Dep. at 90.) Johnson admits that he called Hicks a "punk" (referring to a prisoner's homosexual partner), "faggot," "fag" and "S.O.B." as a reaction and in response to Hicks' harassing comments. (Johnson Aff. p 35.) Johnson also occasionally used profane language while at work. (Johnson Dep. at 43.) Hicks never physically touched Johnson, never threatened Johnson, never exposed himself to Johnson, never called Johnson at home or came to his home, and never sent him anything in writing. (Johnson Dep. at 107-08; Def. Statement of Undisputed Material Facts p 42.)
 
 
 7
 On July 15, 1993, Hicks told another employee in Johnson's presence "I think I'm going to get my dick sucked tonight" and looked in a threatening manner at Johnson. (Johnson Aff. p 42.) Johnson responded, "I'm sick of you fucking with me. What is your goddamn problem?" (Id.) Hicks made a "come on" motion with his fingers and said, "Across the street, across the street." Johnson responded, "No, let's talk about it now," but eventually agreed to go across the street during the lunch hour. (Id. at p 43.) Johnson and Hicks drove their cars off the company premises and across the street. Johnson stated, "Why are you fucking with me, what's the problem, because I want this stopped now." (Id. at p 45.)
 
 
 8
 (Plaintiff's App. 3-4.)
 
 
 9
 The record further indicates that when the two men went across the street, Johnson arrived first, got out of his car, and stood along side it. Shortly thereafter, Hicks pulled up across the street, walked to his car trunk and removed a jack stand. Consequently Johnson went to his car trunk and grabbed a baseball bat. Both men exchanged blows and Hicks was knocked on his back. Johnson continued to strike Hicks with his bat. Afterwards Hicks was transported by ambulance to a hospital. Johnson returned to work.
 
 
 10
 Both men were immediately suspended while Coca-Cola investigated the altercation. Thereafter they were terminated for engaging in the fight, which violated Coca-Cola's rules of conduct. Johnson was charged criminally with aggravated battery but the jury acquitted him on grounds of self-defense.
 
 
 11
 The instant suit ensued but, as previously noted, the district court dismissed Johnson's common-law claims and granted summary judgment in Coca-Cola's favor on his Title VII claims.
 
 ANALYSIS
 Same-sex harassment
 
 12
 In the district court's opinion granting defendant's motion for summary judgment, Judge Warren concluded that same-sex harassment is included in Title VII's prohibition against discrimination based on gender. The opinion noted the split in the authorities in the federal courts-some holding that same-sex harassment is not cognizable under Title VII, others holding to the contrary--and decided to follow a dictum of this Court in Baskerville v. Culligan International Co., 50 F.3d 428, 430 (1995), where Chief Judge Posner, writing for the panel, remarked "[s]exual harassment of women by men is the most common kind, but we do not mean to exclude the possibility that sexual harassment of men by women, or men by other men, or women by other women would not also be actionable in appropriate cases." In accord with Baskerville's dictum, Judge Warren cited Griffith v. Keystone Steel and Wire, 887 F.Supp. 1133, 1136 (C.D.Ill.1995) and Vandeventer v. Wabash Nat'l Corp., 887 F.Supp. 1178, 1181 (N.D.Ind.1995).[3] The district judge also cited the Equal Employment Opportunity Commission's Compliance Manual, CCH § 615.2(b)(3), as support for the proposition that the respective sexes of the harasser and the victim are irrelevant as to a violation of Title VII. The Compliance Manual expressly states that "[t]he victim does not have to be of the opposite sex from the harasser." Id. In accord with these authorities the district judge concluded that same-sex harassment fell within the purview of Title VII.
 
 
 13
 Judge Warren read Baskerville's dictum correctly. Subsequently, in Doe v. City of Belleville, Illinois, 119 F.3d 563 (7th Cir.1997), this Court explored the subject in an exhaustive opinion by Judge Rovner, with Judge Manion concurring in part and dissenting in part, and concluded that same-sex harassment was actionable under Title VII. In view of the recency of Judge Rovner's comprehensive treatment of the issue in Doe, there is no need to rehash the analysis here. It is sufficient to state that in accordance with Doe, we agree with Judge Warren's interpretation of Title VII as including a prohibition against sexual harassment of men by other men.
 
 
 14
 In holding that Johnson did not satisfy the requirements for a same-sex harassment cause of action, Judge Warren concluded that Hicks' conduct was not sufficiently severe or pervasive for Johnson to establish a case of sexual harassment under Title VII. Judge Warren found that Hicks' conduct did not "cross 'the line that separates the merely vulgar and mildly offensive from the deeply offensive and sexually harassing.' " (Plaintiff's App. at 14-15) (quoting Carr v. Allison Gas Turbine, 32 F.3d 1007, 1010 (7th Cir.1994)). In this regard, the district judge observed that Johnson responded to Hicks with coarse language and derogatory comments, and concluded, notwithstanding self-serving statements in his affidavit, that the evidence did not indicate that Johnson was at all intimidated by Hicks.[4]
 
 
 15
 Most importantly, Judge Warren found that Johnson had failed to raise a genuine issue of material fact as to whether Hicks harassed him because of his gender. Id. at 16 ("The record reflects no evidence that Hicks directed the remarks at Johnson because Johnson is a man.") Cf. Vandeventer, 887 F.Supp. at 1181 n. 2 ("while the epithet used ["dick sucker"] and the taunting had a 'sexual' component, as do most expletives, the crucial point is that the 'harasser' was not aiming expletives at the victim because of the victim's maleness"). Viewing the evidence in its entirety, the district judge concluded that "the facts of the fight [between Hicks and Johnson] present a personal grudge match between two workers rather than a case of sexual harassment." (Plaintiff's App. at 15).
 
 
 16
 Although this case presents a close call, we conclude on this particular record that Johnson failed to raise a triable issue as to whether Hicks' comments were because of Johnson's gender. Besides the sexual content of Hicks' remarks there is absolutely nothing in this record that supports a reasonable inference that the remarks were directed at Johnson on account of his gender. Although explicit sexual content or vulgarity may often take a factfinder a long way toward concluding that harassing comments were in fact based on gender, see generally Doe, this need not necessarily be the case. Most unfortunately, expressions such as "fuck me," "kiss my ass," and "suck my dick," are commonplace in certain circles, and more often than not, when these expressions are used (particularly when uttered by men speaking to other men), their use has no connection whatsoever with the sexual acts to which they make reference-even when they are accompanied, as they sometimes were here, with a crotch-grabbing gesture. Ordinarily, they are simply expressions of animosity or juvenile provocation, and there is no basis in this record to conclude that Hicks' usage was any different.
 
 
 17
 Perhaps recognizing this deficiency in his showing, Johnson tries desperately to bring sexuality into the picture by referring to Hicks as a homosexual and referring to Hicks' remarks as "homosexual advances," "homosexual overtures," and "homosexual onslaughts." But the record does not support Johnson's characterization of Hicks as homosexual. Johnson's only showing in this regard is his own deposition testimony in which he rather weakly asserts that Hicks "very possibly" was a homosexual--and this is no showing at all.[5] Moreover, Johnson's contention that Hicks' remarks really did constitute some sort of homosexual advance is belied by his own testimony regarding some of Hicks' other remarks directed at Johnson. For example, Johnson testified that on one occasion, Hicks approached him and said: "I'm going to get my dick sucked," and then, apparently referring to Johnson's girlfriend, Hicks said "I think she's probably watching TV now. I'll go by and have that bitch suck my dick." Hicks also said, "that bitch ought to be getting in the shower right now.... [T]hat redhead bitch got a nice ass too. I ought to go get my dick sucked." It is extremely difficult to reconcile remarks such as these with Johnson's strained contention that Hicks was making "homosexual advances" toward him.[6]
 
 
 18
 In this case, the plaintiff's sole evidence bearing on the gender-based nature of Hicks' provocations is the facially sexual content of Hicks' remarks. Upon scrutiny, however, no reasonable factfinder could conclude that Hicks directed his vulgar comments at Johnson because of his gender. It appears plain on the record as a whole that Hicks' remarks to Johnson were nothing other than vulgar provocations having no causal relationship to Johnson's gender as a male. Accordingly we agree with the district court that Johnson failed to raise a genuine issue of material fact as to this issue.
 
 
 19
 Although the conclusion we reach today may appear at first blush to be in some tension with the analysis in Doe, there are marked factual distinctions between the harassment suffered by plaintiff H. in that case and the harassment suffered by Johnson. In contrast to the instant case, plaintiff H. in Doe was confronted with an assortment of attacks (verbal and physical), all of which converged to support the conclusion that the remarks and conduct involved in that case truly were gender-based. As the Doe majority summarized: "On any given work day, H. [Doe] was faced with the prospect of having his gender questioned ('Are you a boy or a girl?'), having a co-worker, Jeff Dawe, repeat his threat to assault H. sexually ('I'm going to take you out in the woods and give it to you up your ass'), often with the encouragement of others (who urged Dawe to 'get a piece of that young ass' and asked if H. was 'tight or loose' and 'would he scream or what?'), and, ultimately, having his testicles grabbed in a proclaimed effort to determine once and for all whether he was male or female ('Well, I guess he's a guy.')." Doe, 119 F.3d at 572. Furthermore, unlike the instant case, the harassers in Doe expressed and exhibited hostility to the way in which plaintiff H. exhibited his sexuality, which Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268, tells us is discrimination "because of" sex. See generally Doe, 119 F.3d at 597-98 (noting that plaintiff H.'s harassers were motivated in part by his failure to conform to stereotypical male standards); id. at 600 ("Just as in Price Waterhouse, then, gender stereotyping establishes the link to the plaintiff's sex that Title VII requires.").
 
 
 20
 In concluding that the campaign of harassment to which H. Doe was subjected was "based on" Doe's gender (as opposed to being "general unpleasantness" or "generic 'shoptalk' "), the Doe majority observed:
 
 
 21
 [The harassment] was targeted specifically at H. and it was explicitly sexual--it both revolved around his gender and specifically alluded to sexual conduct. * * * In view of the overt references to H.'s gender and the repeated allusions to sexual assault, it would appear unnecessary to require any further proof that H.'s gender had something to do with this harassment; the acts speak for themselves in that regard.
 
 
 22
 Id. at 589-90. Moreover, the Doe majority made quite clear that its determination was based on the totality of the harassment suffered by plaintiff H. in that case: "[T]he overall context of the harassment alleged in this case--the name-calling, the references to sexual assault, and the intrusive, intimate, touching, all of which expressly invoked H.'s gender--certainly makes it reasonable to infer that the workplace was made hostile to him because of his gender." Id. at 596.
 
 
 23
 Johnson's showing in this regard is almost completely lacking and certainly falls far short of that presented in Doe. Indeed, Johnson's showing amounts to nothing more than the fact that Hicks repeatedly provoked him with a sexually explicit taunt. As Johnson's own submissions reveal, Hicks did not single out Johnson as the object of his vulgar taunting--at least two other workers at the Coca-Cola plant were harassed by Hicks in a similar fashion. Nor is there any evidence that Hicks ever made any reference, direct or indirect, to Johnson's gender in any of their exchanges over the course of their work relationship. Rather, Johnson's sole reliance is on taunting references to a sexual act; and, as we have attempted to show above, we are unpersuaded that Hicks' reference was genuinely sexual at all. Finally, although ultimately there was a physical altercation between Johnson and Hicks, that altercation was not of a sexual nature--as was the physical assault of plaintiff H. in Doe. Nor was the altercation directly related to the content and nature of the alleged harassment--as was the assault of plaintiff H. On this showing we are completely unable to find that Hicks' harassment of Johnson was "inseparable from [Johnson's] gender" or "inescapably and irrevocably linked to [Johnson's] gender."[7] Doe, 119 F.3d at 594 & 595. Cf. Galloway v. General Motors Service Parts Operations, 78 F.3d 1164 (7th Cir.1996) (male co-worker's conduct in calling a female co-worker a "sick bitch" and remarking "suck this bitch" while making an obscene gesture found not to be sex- or gender-related).
 
 
 24
 In reconciling Doe with this case it is important to recognize that Doe's fundamental teaching is that the same law that the Supreme Court has mandated for sexual harassment cases involving members of the opposite sex ought to apply equally when the perpetrator and victim are of the same sex. In the different sex situation, we do not ask a slew of subjective and invasive questions about the sexual orientation of the perpetrator or of the victim. We ask whether the treatment meted out created a hostile work environment because the victim was singled out because of his or her gender, and if so, whether the treatment was so severe and pervasive as to alter the conditions of the victim's employment in a significant way. See Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49. Whether the environment was so hostile as to be actionable turns on the totality of the circumstances including the nature of the harassment and the context in which it occurred. Id. at 69, 106 S.Ct. at 2406; Hutchison v. Amateur Elec. Supply, Inc., 42 F.3d 1037, 1043 (7th Cir.1994).
 
 Retaliation
 
 25
 In its final discussion of Count VI, the district court concluded that plaintiff's claim that he was fired in retaliation for his harassment complaints was insufficient because there was no genuine question as to the grounds for his termination: He was fired for fighting with Hicks and not in retaliation for his harassment complaints (Plaintiff's App. 19-20). On this record we cannot fault the district court for concluding that plaintiff's discharge was a result of the Hicks-Johnson altercation rather than in retaliation against Johnson for his harassment complaints. It is undisputed that Coca-Cola maintained a policy against, among other things, "striking, provoking a fight, or attempting bodily harm to another employee." It is also undisputed that Coca-Cola's proffered reason for terminating Johnson was his violation of this rule (and others that need not concern us here). Finally, it is undisputed that Hicks was also fired as a result of the fight with Johnson. Against this evidence of a legitimate, nondiscriminatory justification for Johnson's termination, Johnson offers nothing but his contention that he acted in self-defense and the assertion that a jury could disbelieve Coca-Cola's explanation. These are insufficient showings to rebut Coca-Cola's proffered reason. The former contention suggests that Coca-Cola may have acted unfairly, but Title VII does not prohibit unfairness or wrongheaded decisions in the workplace. See, e.g., Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir.1997) ("when an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination."); Castleman v. Acme Boot Co., 959 F.2d 1417, 1422 (7th Cir.1992) ("Castleman must do more ... than show that Acme was mistaken or unfair in its decision to fire him--the evidence must support a conclusion that Acme 'made up' its reason for the discharge."). As to the latter contention, this Court has consistently rejected such assertions as a basis for getting to a jury. See, e.g., Giannopoulos, 109 F.3d 406, 411 (7th Cir.1997) ("Giannopoulos cannot avoid summary judgment with an unadorned claim that a jury might not believe Brach's explanation for his termination; he must point to evidence suggesting that Brach itself did not honestly believe that explanation."); Emmel v. Coca-Cola Bottling Co. of Chicago, 95 F.3d 627, 634 n. 3 (7th Cir.1996) ("the argument that a jury might not believe the proffered legitimate business reason is not enough to defeat summary judgment"). Accordingly the district court properly granted summary judgment in Coca-Cola's favor on Johnson's retaliation claim.
 
 
 26
 Dismissal of malicious prosecution claim (Count I)
 
 
 27
 The district court dismissed Johnson's malicious prosecution claim (Count I) for failure to state a claim. The court concluded that Coca-Cola had probable cause to believe that Johnson committed a battery and was therefore justified in cooperating with law enforcement authorities. Under Wisconsin law, to prevail on a claim of malicious prosecution a plaintiff must establish, among other things, that the defendant lacked probable cause for instituting the underlying proceeding. See Pollock v. Vilter Mfg. Corp., 23 Wis.2d 29, 36, 126 N.W.2d 602 (1964). "Probable cause," in turn, is defined as "that quantum of evidence which would lead a reasonable layman in the same circumstances to honestly suspect that another person had committed a crime." Id. at 41-42, 126 N.W.2d 602. We concur with the district court's ultimate conclusion that under the facts alleged by Johnson, Coca-Cola had an honest suspicion that Johnson had committed a battery.
 
 
 28
 In short, Johnson pleaded himself out of court with regard to his malicious prosecution claim. See Jackson v. Marion County, 66 F.3d 151, 153 (7th Cir.1995) ("a plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts"). The allegations of Johnson's complaint acknowledge that he accepted Hicks' suggestion to go " 'across the street' ... to settle the matter [because] Coca-Cola had done and would do nothing to protect him from harassment by Hicks and he felt he had no choice but to try to deal with the problem directly with Hicks." Complt. p 11. The complaint further admits that Johnson struck Hicks with a baseball bat and injured him. Id. These allegations--that two men went to settle a work dispute, one armed with a car jack, the other armed with a baseball bat, and the latter hit and injured the former--sufficiently demonstrate that Coca-Cola had reason honestly to suspect that Johnson had committed the crime of battery. Because Pollock requires that there be "want of probable cause for the institution of the former proceeding" to sustain a malicious prosecution suit, the district judge was justified in dismissing this count.
 
 
 29
 Johnson's allegation that he acted in self-defense does not insulate him from this conclusion. Wisconsin law does not require that laypersons appreciate all of the nuances and distinctions contained in the law. As the Wisconsin Supreme Court explained in Pollock: "[A] businessman, untrained in the law, may well feel that the other party was an 'embezzler' in the sense that the term is used in everyday life, and legitimately report his suspicions to the police or prosecutor. Moreover, we may note, generally, that many kinds of anti-social behavior cannot be deemed 'crimes' in the legal sense of that term. Yet this fact, while appreciated by those trained in the law, is often not perceived by intelligent laymen. It is unfair, therefore, to hold a layman to the same standard as a prosecutor in evaluating whether he had 'probable cause' to believe that another person committed a crime, and consequently presented his information to the prosecutor." 23 Wis.2d at 42, 126 N.W.2d 602. Also, the fact that Johnson alleges in his complaint that he acted in self-defense is largely irrelevant. The presence or absence of probable cause depends on what the defendant knew or ought to have known at the time of instituting the underlying criminal prosecution. Elmer v. Chicago & N.W. Ry. Co., 260 Wis. 567, 570-571, 51 N.W.2d 707 (1952). In view of the factual allegations discussed above and the absence of any other allegations reasonably supporting the inference that, despite those facts, Coca-Cola knew or should have known at the time of cooperating with the Milwaukee prosecutor's office that Johnson had not committed a crime, Johnson has failed to allege a cause of action for malicious prosecution.
 
 
 30
 Although the district court reached the correct outcome, two errors in the decision warrant brief comment. As he does here, Johnson argued to the district court that under Hajec v. Novitzke, 46 Wis.2d 402, 175 N.W.2d 193 (1970), his acquittal on the aggravated battery charge is prima facie evidence of want of probable cause. The district court agreed with Johnson's view of Wisconsin law, see Plaintiff's App. at 5-6 ("In Wisconsin, acquittal apparently constitutes prima facie evidence of want of probable cause," citing Hajec), but disregarded the purported holding of Hajec, stating "The Court has some doubt as to the continuing vitality of this holding." Id. fn. 1. Putting aside the district court's improper disavowal of what it believed to be the Wisconsin Supreme Court's statement of the governing legal principle, see Beam v. IPCO Corp., 838 F.2d 242 (7th Cir.1988) ("This court's mandate in diversity cases ... does not permit us to disregard a clear statement of the law by a state's highest court in order to indulge our own views of consistency or sound policy."), the sounder response to Johnson's contention is that his reliance on Hajec is misplaced. The rule recited by the Wisconsin Supreme Court in Hajec, which traces its lineage to Bigelow v. Sickles, 80 Wis. 98, 49 N.W. 106 (1891), is that "where ... a defendant in a criminal prosecution is discharged, that is prima facie evidence of want of probable cause." Hajec, 46 Wis.2d at 415, 175 N.W.2d 193. Johnson misunderstands this language to mean that where a defendant is acquitted after a trial on the merits, that acquittal is prima facie evidence of want of probable cause. However, the Wisconsin Supreme Court has long distinguished between discharge of a criminal action by a magistrate on the examination of a criminal complaint (a probable cause determination) and an acquittal following trial. See Cullen v. Hanisch, 114 Wis. 24, 34-36, 89 N.W. 900 (1902). In Cullen, the court distinguished between discharge by a magistrate and acquittal following trial, and stated quite explicitly that "discharge of the plaintiff [by acquittal following trial] could not properly be regarded even as prima facie evidence of want of probable cause." Id. at 35, 89 N.W. 900. Thus Johnson's contention that his acquittal constitutes prima facie evidence of want of probable cause is entirely without merit.[8]
 
 
 31
 The district court also erred in holding Johnson to what he perceived to be "heightened pleading requirements" under Wisconsin law. Even if Wisconsin does hold to a heightened pleading standard for malicious prosecution claims (an issue we need not decide), it is rudimentary that pleading requirements in the federal courts "are governed by the federal rules and not by the practice of the courts in the state in which the federal court happens to be sitting." 5 Wright & Miller, Federal Practice and Procedure § 1204; see Hanna v. Plumer, 380 U.S. 460, 465, 85 S.Ct. 1136, 1140, 14 L.Ed.2d 8 (procedural requirements in federal court are governed by federal procedural law); Colton v. Swain, 527 F.2d 296, 304 (7th Cir.1975) (fact that complaint may have failed to meet Illinois pleading requirements not determinative, federal pleading requirements govern). While the district court cited Wright & Miller for the proposition that in a number of jurisdictions "the pleading burden imposed on a plaintiff in a malicious prosecution action is somewhat higher than it is in the typical civil action," id. § 1246, it disregarded the immediately following passage:
 
 
 32
 It is thus not surprising to find decisions in which a federal court sitting in diversity jurisdiction applies the more demanding pleading rules of the forum state rather than the Rule 8(a) standard. This seems to be a questionable practice, especially in light of Hanna v. Plumer. It would be better if the federal court effectuated the substantive policy of the state without doing violence to the federal pleading rules.
 
 
 33
 Id. Following Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517, it is clear that federal courts may not impose heightened pleading requirements except where such requirements are found in the federal rules. Thus to the extent that the district court held Johnson to heightened pleading requirements it was error. Nevertheless, as explained above, it is clear that Johnson alleged facts that showed he has no claim for malicious prosecution; hence the error was harmless and dismissal of Count I was warranted.
 
 
 34
 Dismissal of common law tort claims (Counts II-V)
 
 
 35
 The court also dismissed common law tort Counts II-V because the Wisconsin Worker's Compensation Act provides the exclusive remedy for injuries suffered by an employee from conduct such as defendant's. See Wis. Stats. § 102.03(2). Here again we affirm; however, as explained below, we affirm the dismissal of Johnson's assault and battery claim on grounds different from those relied on by the district court.
 
 
 36
 The Wisconsin Supreme Court has repeatedly held that " § 102.03(2) precludes an injured employe from maintaining a negligence action ... against his or her employer and fellow employe." Byers v. Labor and Industry Review Commission, 208 Wis.2d 388, 561 N.W.2d 678, 684 n. 9 (Wis.1997). Count V of Johnson's complaint, which alleges negligent supervision and retention of Hicks, falls squarely within the reach of § 102.03(2) and was properly dismissed. Moreover, it is not only actions sounding in negligence that are barred by the exclusivity provision. The Wisconsin Supreme Court has clearly stated that "injuries that are caused by intentional conduct may lie within the purview of 'accident' under the [Worker's Compensation Act] and may constitute compensable injuries under the [Act]," Jenson v. Employers Mutual Casualty Co., 161 Wis.2d 253, 264, 468 N.W.2d 1 (1991), and has expressly held that claims of intentional infliction of emotional distress are barred by § 102.03(2). Id. We are unpersuaded by Johnson's efforts to distinguish Jensen; thus Count III was properly dismissed.
 
 
 37
 Unlike the district court's disposition as to the intentional infliction and negligent supervision claims,[9] the court's dismissal of Johnson's assault and battery claim (Count II) cannot be sustained on the basis of Worker's Compensation exclusivity. In order for employer liability under the Worker's Compensation Act to be triggered, the injured employee at the time of injury had to have been "performing service growing out of and incidental to his or her employment" and "the accident or disease causing injury [must have arisen] out of the employment." Weiss v. City of Milwaukee, 208 Wis.2d 95, 559 N.W.2d 588, 591 (1997). Addressing the meaning of the statutory clause "performing service growing out of and incidental to his or her employment" in Weiss, the Wisconsin Supreme Court explained:
 
 
 38
 "[P]erforming service growing out of and incidental to his or her employment" is used interchangeably with the phrase "course of employment." ... Both phrases refer to the "time, place, and circumstances" under which the injury occurred....
 
 
 39
 An injury is said to arise in the course of the employment when it takes place within the period of the employment, at a place where the employee reasonably may be, and while he [or she] is fulfilling his [or her] duties or engaged in doing something incidental thereto.
 
 
 40
 1 [Larson & Larson] The Law of Workmen's Compensation § 14.00.
 
 
 41
 Weiss, 559 N.W.2d at 592 (citations omitted). The Court specifically held in Weiss that the act of taking a personal phone call at work to attend to a personal matter constituted only a momentary departure from work duties and that such conduct was incidental to employment and therefore within the course of employment. Id. at 593 ("Under the liberal construction given to Chapter 102, an employee acts within the course of employment when he or she is otherwise within the time and space limits of employment, and briefly turns away from his or her work to tend to matters necessary or convenient to his [or her] own personal health or comfort.") (internal quotation marks omitted). However, the Court distinguished such momentary departures from more significant ones:
 
 
 42
 The personal comfort doctrine does not apply, and an employee is not within the course of employment, if the extent of the departure is so great that an intent to abandon the job temporarily may be inferred, or ... the method chosen is so unusual and unreasonable that the conduct cannot be considered an incident of the employment.
 
 
 43
 Id. (internal quotation marks omitted).
 
 
 44
 Taking a personal phone call at work is plainly distinguishable from leaving one's work premises in order to settle a dispute with a co-worker. In the latter case, "an intent to abandon the job temporarily" may quite reasonably be inferred. Moreover, leaving the work-site to have it out is plainly "so unusual and unreasonable that the conduct cannot be considered an incident of employment." Indeed, on facts much more benign than those presented here, the Wisconsin Supreme Court has held that injuries suffered by an employee while fighting with a co-worker on work-premises were not compensable under the Worker's Compensation Act. Vollmer v. City of Milwaukee, 254 Wis. 162, 35 N.W.2d 304 (1948). In Vollmer, the Court explained its holding as follows:
 
 
 45
 Vollmer, instead of continuing, as required in the course of his employment, to perform his duties as watchman on the second and other upper floors, deliberately stepped out of that course of employment by going down to the first floor and there assaulting Balistreri. That assault originated entirely by reason of Vollmer's conduct in furtherance of solely his own wrongful purpose and it was wholly outside the scope of his employment and foreign to his performance of any service growing out of or incidental thereto. In initiating the incident and making the assault on his own accord he was not performing any duty or service for his employer. Nor was the assault or the injury which he sustained a natural incident of the work which he was required to perform.
 
 
 46
 Id. at 166, 35 N.W.2d 304. Quoting one of its earlier decisions, the Vollmer court continued:
 
 
 47
 An employee may momentarily step aside from his employment and such a step may effectually break the master and servant relationship. An employee may wilfully do a wrongful act for purposes entirely foreign to his employment and while so acting take himself without the scope of his employment. Such a departure from the scope of one's employment, measured in terms of time and space, may be very slight. Nevertheless, if the act performed by one is in furtherance of his own purposes and without the scope of his employment, the master may not be liable.
 
 
 48
 Id. (internal quotation marks and citations omitted). Precisely the same analysis governs here. The fact that Johnson may have accepted the offer to "go across the street" instead of making the offer is a distinction that makes no difference here. The point remains that Johnson unequivocally abandoned his employment when he drove off the Coca-Cola premises to resolve his differences with Hicks. That objective was purely personal and outside the scope of his employment. Accordingly, he was not performing any service growing out of and incidental to his employment. Because the conditions for employer liability under the Worker's Compensation Act were not met, the Act's exclusivity provision is inapplicable and the district court erred in holding that the Act barred Johnson's assault and battery claim. (In light of our conclusion regarding this statutory condition, we need not consider the "arising out of" condition.).[10]
 
 
 49
 Ordinarily at this point we would remand for further consideration; however, in this case such a remand would be futile because it is clear that Johnson could prove no set of facts under which Coca-Cola would be liable for Hicks' battery of Johnson. Johnson's theory for holding Coca-Cola liable for Hicks' assault and battery, is that Coca-Cola (as Hicks' principal) ratified Hicks' assault and battery by failing to take effective measures to prevent it. This is a questionable theory to begin with--"ratification" in the law of agency refers to conduct by the principal after an agent has acted purportedly on behalf of the principal. See Restatement (Second) of Agency § 82 ("Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him."). Thus the theory of ratification has no applicability here. But giving Johnson the benefit of the doubt and assuming that he is referring to some sort of respondeat superior liability, it is clear that his theory is fatally doomed by the force of his own arguments. The foregoing Worker's Compensation analysis is a double-edged sword, for just as Johnson abandoned his employment when he drove across the street to resolve his dispute with Hicks, so did Hicks. Hicks, like Johnson, was simply not acting within the scope of his employment when he battered Johnson--his motivation for the battery was not in the least actuated by a desire to serve Coca-Cola. Hence there is no basis in tort or agency law for holding Coca-Cola liable for Hicks' battery of Johnson on July 15, 1993. Accordingly, dismissal of the assault and battery claim is warranted.
 
 
 50
 Judgment affirmed.
 
 
 
 [1]
 Johnson's complaint alleges that Hick's course of conduct included:
 "repeatedly telling the plaintiff, 'I'm going to make you suck my dick,' 'come down to the carwash and suck my dick,' 'come across the street and suck my dick,' and the like. Often this conduct was accompanied by Hicks touching himself as if masturbating through his clothes and by his coming up to within inches of the plaintiff's face. Hicks often also intimidated, demeaned and humiliated the plaintiff because of his gender by saying that he [Hicks] would have 'that redhead bitch (referring to the plaintiff's fiance, who often picked him up after work or brought him his lunch) suck my dick' and similar and worse remarks."
 Complt. p 7.
 
 
 [2]
 Johnson testified that his use of the term "punk" was intended to have the same meaning as "fag" and that in prison the term "punk" means a homosexual partner. Johnson was aware that Hicks had previously served time in prison
 
 
 [3]
 The cases on both sides of the question are collected in Doe v. City of Belleville, Illinois, 119 F.3d 563 (7th Cir.1997). Doe concludes that such claims are cognizable. Contra, e.g., Oncale v. Sundowner Offshore Servs., Inc., 83 F.3d 118 (5th Cir.1996), certiorari granted, --- U.S. ----, 117 S.Ct. 2430, 138 L.Ed.2d 192(1997)
 
 
 [4]
 Johnson readily concedes that he responded in kind to Hicks' remarks. By way of illustration, when asked during his deposition how he had responded to a particular instance of Hicks' provocation, Johnson testified:
 I said, "I'm getting sick and tired of your shit." Probably called him a punk or fag, or something. "you're the one who likes to suck dicks you son of a"--SOB, probably, or something on that order. And I just told him to stop fucking with me or harassing me.
 Johnson Dep. at 110.
 
 
 [5]
 We do not mean to suggest that in cases involving male sexual harassment of another male it is necessary to show that the harasser is homosexual. The point here is simply that insofar as Johnson attempts to establish that Hicks' remarks were truly sexual in nature (as opposed to being simply vulgar provocation) by calling him homosexual and his remarks "homosexual advances," he has completely failed in his showing
 
 
 [6]
 Two other comments are warranted here. Johnson suggests that the fact that Hicks harassed two other men at the Coca-Cola plant is somehow indicative of the fact that Hicks' harassment of his co-employees was gender-based. However, the record reveals that Johnson and Hicks worked in an all-male work environment. Thus Hicks' failure to harass (nonexistent) female co-workers is an entirely unpersuasive argument. We are similarly unmoved by Johnson's statement, "There were no female workers in the area where Hicks and I worked. Occasionally female workers would come to or pass through the area. Sometimes a worker's wife or girlfriend including my fiance, would come to the plant to deliver a lunch or pick a worker up at the end of his shift. I never saw Hicks harass or make sexual comments to any female employees or visitors. His sexual conduct ... was directed only at males." Conspicuously absent from this statement is any suggestion that Hicks did harass men who were transiently passing through the work area (as opposed to those with whom he had close and regular contact). Thus Hicks' apparent failure to direct his vulgar comments toward female passers-by is of no evidentiary significance
 
 
 [7]
 We are mindful of the fact that in its thoughtful discussion of the subject, the Doe majority suggests that where the harassing conduct has explicit sexual overtones, no further proof of the fact that the harassment is gender-based may be necessary because "[a]rguably, the content of that harassment in and of itself demonstrates the nexus to the plaintiff's gender that Title VII requires." Doe, 119 F.3d at 588 While the majority decision in Doe sets out this argument, it is clear that the majority did not ultimately rely on it as the basis for its decision because the majority found sufficient additional evidence linking the conduct at issue to the plaintiff's gender. See id. at 597. Furthermore, unlike the instant case, Doe is not a case involving only the use of a sexually explicit provocation. As the discussion in the text explains, the harassers in Doe explicitly referenced the plaintiff's gender during the course of their harassment and sexually assaulted the plaintiff. Accordingly the Doe decision was expressly based on "the overall context of the harassment alleged in [the] case," id. at 596, and not the mere fact that some of the alleged harassment had sexual overtones. Here we are unable to find that Hicks' repeated use of a sexually explicit provocation, standing alone as it does, is sufficient to raise a triable issue as to whether the harassment suffered by Johnson was because of his gender. It should be noted that in the context of opposite-sex sexual harassment this Court has repeatedly distinguished between vulgar shop banter and actionable sexual harassment, see, e.g., McKenzie v. Illinois Dep't of Transp., 92 F.3d 473, 479-480 (7th Cir.1996); Baskerville v. Culligan Int'l Co., 50 F.3d 428 (7th Cir.1995)
 In Baskerville [v. Culligan Int'l Co., 50 F.3d 428 (7th Cir.1995) ], we explained that a line exists between workplace vulgarity and actionable harassment. It is not a bright line that separates "intimidating words or acts[,] obscene language or gestures" from "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." Id. But neither will the line be blurred by confusing the distasteful or inappropriate remarks with the deeply offensive and sexually harassing ones.
 Brill v. Lante Corp., 119 F.3d 1266, 1274 (7th Cir.1997). Although generally drawn in a different context, the distinction is equally appropriate here.
 
 
 [8]
 In Hajec, the criminal defendant's prosecution was voluntarily dismissed by the prosecutor prior to trial (but apparently after an initial probable cause determination). Although Hajec arguably extended the reach of Bigelow's holding somewhat, it does not go so far as to support Johnson's contention that acquittal after trial constitutes prima facie evidence of want of probable cause. Certainly there is no indication in Wisconsin decisions that the distinction drawn in Cullen is no longer a critical distinction
 
 
 [9]
 In his arguments to this Court, Johnson makes no reference to his invasion of privacy claim (Count IV). Accordingly, any such arguments are waived and we will not consider that claim
 
 
 [10]
 Johnson's assault and battery claim is not limited to his July 15, 1993, fight with Hicks. In addition, the claim encompasses Hicks' workplace assaults of Johnson "[o]n and before July 15." Our discussion in the text does not apply to these workplace assaults, which were clearly suffered by Johnson while performing services growing out of and incidental to his employment. Further, the Wisconsin Supreme Court's decision in Weiss compels the conclusion that the accident causing Johnson's injury arose out of his employment. See Weiss, 559 N.W.2d at 593. Thus to the extent that the assault claim contained in Count II is premised on pre-July 15 workplace assaults, that portion of the claim is barred by the Worker's Compensation exclusivity provision