151 F.3d 1032
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Eldridge CATLEDGE, Plaintiff-Appellant,
v.
BOARD OF EDUCATION OF THE CITY OF CHICAGO, et al.,
Defendants-Appellees.
 No. 96-2511.
 United States Court of Appeals, Seventh Circuit.
 June 10, 1998.
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division.
 Before Hon. JESSE E. ESCHBACH, Hon. KENNETH F. RIPPLE, and Hon. TERENCE T. EVANS, Circuit Judges.
 
 Submitted April 28, 1998[1]
 LEFKOW, Magistrate J.[2]
 ORDER
 
 1
 Eldridge Catledge appeals from a judgment entered on a jury verdict in favor of his former employer, the defendants, the Board of Education of the City of Chicago and its individual Board members in their official capacities. Catledge filed suit under Title VII, alleging sexual harassment based on a theory of quid pro quo. He claimed that he was displaced from his job as a high school teacher after he refused to continue a previously consensual seven-year sexual relationship with the school's assistant principal. He also claimed that he was ultimately forced to retire due to intolerable working conditions at his new assignment.
 
 
 2
 The evidence at trial established that Catledge worked for over 25 years as a business education teacher at Hyde Park Career Academy, a public high school in Chicago. The parties agree that massive changes were made in the Chicago school system in October 1993. The school year started late because the school district was without sufficient funds or an approved budget. Consequently, the Board of Education had to make substantial cuts, including two major changes which affected the 27,000 teachers and 550 schools in Chicago. First, an early retirement program was offered. Out of 10,000 eligible teachers, approximately 2,500 chose to take early retirement including, eventually, Catledge. Second, the high school class periods were cut from nine to seven periods each day, which resulted in the "displacement" of hundreds of high school teachers, including Catledge, to temporary assignments in elementary schools. Catledge testified that he believed his displacement from Hyde Park to an elementary school was manufactured by the assistant principal at Hyde Park, with whom Catledge asserts he had a sexual relationship between 1983 and 1990.
 
 
 3
 At a Sunday, October 24, 1993, meeting of the Bureau of Teacher Personnel regarding teacher assignments and transfers, the assistant principal was present, on the authority of Hyde's principal, Dr. Weldon Beverly, to represent Hyde Park. It was the assistant principal who telephoned Catledge from that meeting and told him to report to an elementary school instead of Hyde. Plaintiff presented witnesses that the assistant principal had the responsibility for opening and closing programs and positions at Hyde Park. However, the Board presented substantial evidence that the assistant principal did not have the authority, and in fact did not make, the decision to displace Catledge.
 
 
 4
 Catledge testified that he was sent from one elementary school to another in late October 1993, back to Hyde for a few days, back to several other elementary schools and finally in November 1993 to Deneen Elementary School, where the principal gave him the choice of teaching a regular second grade class, or a learning disability (LD) class with nine 13 and 14 year-old students. Catledge chose the LD class. After seven weeks, he felt he could not longer "cope" with and "was not able to handle" the class. "[T]here was no educational activity going on and I did not need to be there...." On December 15, 1993, the day before the winter break began, he stopped going to Deneen.
 
 
 5
 When school reopened on January 3, 1994, instead of returning to Deneen, Catledge went to the central personnel office and told Maurice Bullett, the acting director of personnel for the Board, that he wanted a high school position. Catledge testified that Bullett told him that a high school position might open up soon. Catledge chose to remain at home, "waiting for an assignment" in a high school, which he felt was necessary "in order for me to be an effective teacher." As a result of Catledge's refusal to teach at an elementary school, on February 1, 1994, Catledge received a letter from Bullett stating that he was considered "absent without leave" and would be terminated if he did not report for work. On March 1, 1993, Catledge obtained a letter from Dr. Earl Thornton, a general practitioner and gynecologist/ obstetrician, stating that Catledge was under stress and should be on medical leave of absence. Plaintiff testified that he suffered from "sleeplessness" and "restlessness" during that period. Although Catledge had missed the February 28 deadline for submitting early retirement papers, the Board decided to accept the medical leave papers submitted by Catledge in May 1994 and make the medical leave retroactive to December 15, 1993, and permit Catledge to choose the early retirement package, effective June 1994.
 
 
 6
 Catledge was replaced at Hyde Park with Emma Bostic, who had less seniority since she had been teaching in the business department at Hyde Park for 22 years, three years less than Catledge. The evidence was conflicting as to whether Bostic had a certification which was narrower then Catledge's, which would mean she could not teach the same broad range of classes that Catledge could teach in the business education department. Like Catledge, during October 1993 Bostic was displaced from Hyde and briefly sent to an elementary school, back to Hyde, then to another elementary school, and finally back to Hyde again.
 
 
 7
 The Board presented evidence that, even if it had erred in displacing Catledge from Hyde Park, perhaps mistakenly believing that his certification or seniority required the displacement, it was done by decision makers other than the assistant principal. Maurice Bullett, the Board's acting director of personnel, testified that he may have erred in handling the administrative aspects of Catledge's displacement assignments. When he arbitrarily chose from the computer what he thought was an open spot, in order to have Catledge assigned for payroll purposes, he chose a position at Hyde which had been designated "closed" on the same day.
 
 
 8
 The assistant principal testified that he never had a sexual relationship with Catledge. "Absolutely not, not true." He also never threatened Catledge or interfered with his position at Hyde Park. The only time he telephoned Catledge at home was in relation to work. He admitted that after the lawsuit was filed, he telephoned Catledge at home, and admitted lying about it at his deposition. A tape of the telephone conversation was played to the jury. During the conversation, the assistant principal asked when Catledge wanted to see him, complained about the allegations made in the lawsuit and remarked that some people would "kill for things like this."
 
 
 9
 The jury found in favor of defendants on the sexual harassment claim, and the district court entered judgment on the verdict.[3]
 
 
 10
 The crux of Catledge's appeal is that the evidence was insufficient to support the jury verdict on the quid pro quo sexual harassment claim.[4] The court is limited to reviewing the record as a whole to determine whether there is a reasonable basis in the record for the verdict. Gorlikowski v. Tolbert, 52 F.3d 1439, 1446 (7th Cir.1995). This court cannot substitute its view of witness credibility for that of the jury. "[W]e are particularly careful in employment discrimination cases to avoid supplanting our view of the credibility or weight of the evidence for that of" the jury. Hybert v. Hearst Corp., 900 F.2d 1050, 1054 (7th Cir.1990).
 
 
 11
 Title VII of the Civil Rights Act prohibits employment decisions based on gender. 42 U.S.C. § 2000e-2(a)(1). The theory of sexual harassment commonly referred to as "quid pro quo" requires proof of a link between the grant-or denial of an economic benefit and the victim's participation in conduct of a sexual nature. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); Bryson v. Chicago State Univ., 96 F.3d 912, 915 (7th Cir.1996); see also EEOC Guidelines, 29 C.F.R. § 1604.11(a). The Supreme Court has recognized that same-sex harassment falls within the protection of Title VII. Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).
 
 
 12
 The parties dispute whether or not Catledge proved at trial the existence of the sexual relationship between the assistant principal and Catledge. Regardless, Catledge must also prove "the 'quo' part of the quid pro quo," that is, answer the question "what tangible aspect of employment was affected?" Bryson, 96 F.3d at 915-16. The jury heard evidence regarding massive changes in the Chicago schools in October 1993. The jury was entitled to believe the substantial evidence offered by defendants that the assistant principal had no authority over, and was not responsible for, Catledge's displacement. Consequently, it would have to conclude that the adverse employment consequence asserted by Catledge, a constructive discharge, could not have resulted from the alleged sexual harassment by the assistant principal. See Chambers v. American Trans Air, Inc., 17 F.3d 998, 1005-06 (7th Cir.1994).
 
 
 13
 In addition, the Board's massive displacement policies applied to everyone. See Skouby v. Prudential Ins. Co. of America, 130 F.3d 794, 798 (7th Cir.1997). Moreover, although the alternative of requiring Catledge (and hundreds of other high school teachers) to teach in the elementary schools may have been unfair, or the result of the erroneous decision by Board personnel to displace Catledge instead of Bostic, or even intolerable to Catledge, there is no evidence that the motive was gender discrimination. See Chambers, 17 F.3d at 1003. As we have previously held, "Title VII does not prohibit unfairness or wrongheaded decisions in the workplace." Johnson v. Hondo, Inc., 125 F.3d 408, 415 (7th Cir.1997); see also Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir.1997) ("it is not our province to decide whether [the employer's] reason was wise, fair, or even correct"); Castleman v. Acme Boot Co., 959 F.2d 1417, 1422 (7th Cir.1992) (plaintiff must do more than show that the employer "was mistaken or unfair in its decision"). The jury was also entitled to rely on the fact that at least three years had passed between the end of the alleged sexual relationship with the assistant principal and Catledge's displacement from Hyde Park. The jury could have believed that the passage of time made it more unlikely that the assistant principal somehow had Catledge displaced in retaliation for his ending the relationship. Cf. McKenzie, 92 F.3d at 485.
 
 
 14
 In addition to the evidence that the assistant principal had no authority and did not influence the decision to displace Catledge, the jury was entitled to conclude that Catledge did not suffer a constructive discharge, but instead chose to quit his job. In order to establish constructive discharge, the working conditions must be so intolerable that a reasonable person would have been compelled to resign, and the working conditions must be intolerable in a discriminatory way. Rabinovitz v. Pena, 89 F.3d 482, 488 (7th Cir.1996). No matter how "horrific the conditions," plaintiff must put forth evidence showing that the employment decision was the result of his gender. Vitug v. Multistate Tax Com'n, 88 F.3d 506, 517 (7th Cir.1996). In addition, the plaintiff "must seek redress while remaining in his job unless confronted with an aggravating situation beyond ordinary discrimination." Rabinovitz v. Pena, 89 F.3d at 489 (citing Brooms v. Regal Tube Co., 881 F.2d 412, 423 (7th Cir.1989)). Accord Drake v. Minnesota Mining & Mfg. Co., 134 F.3d 878, 886 (7th Cir.1998); Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 677 (7th Cir.1993).
 
 
 15
 Accordingly, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 The court has granted the appellant's motion to waive oral argument. Thus, the appeal is submitted on the briefs and the record. See Fed. R.App. P. 34(f); Cir. R. 34(e)
 
 
 [2]
 The parties consented to a trial before a magistrate judge
 
 
 [3]
 At the close of evidence, Catledge did not move for a directed verdict. See Fed.R.Civ.P. 50; Hudak v. Jepsen of Illinois, 982 F.2d 249 (7th Cir.1992). Nevertheless, defendants do not raise the point on appeal. Accordingly, defendants have waived the waiver defense. See McKnight v. General Motors Corp., 908 F.2d 104, 108 (7th Cir.1990) ("[A] defense of waiver is itself waivable.")
 
 
 [4]
 If indeed Catledge attempted to raise a claim of retaliation, he would have to show that he engaged in statutorily protected expression, see McKenzie v. Illinois Dep't of Transp., 92 F.3d 473, 483 (7th Cir.1996), which he makes no attempt to show