Henry Hamilton, III, E.E.O.C., Milwaukee, WI, for Plaintiff.

Kelly Gooch, Lewis Fisher Henderson & Claxton, Memphis, TN, for Defendant.

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**TRUGREEN LIMITED PARTNERSHIP, d/b/a TruGreen–Chemlawn, Defendant.**

No. 98–C–164–C.

United States District Court, W.D. Wisconsin.

March 24, 1999.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for declaratory and injunctive relief brought pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e(2), 2000e(3), by plaintiff Equal Employment Opportunity Commission against defendant TruGreen Limited Partnership. Plaintiff contends that defendant violated Title VII by subjecting one of its former employees, Pete Potaczek, to a sexually hostile work environment. Jurisdiction is present. 28 U.S.C. §§ 1331 and 1343.

The case is before the court on defendant's motion for summary judgment and on plaintiff's motion for partial summary judgment as to several affirmative defenses raised by defendant. I conclude that there is no triable issue of fact that Potaczek was harassed because of his gender. For this reason, defendant is entitled to summary judgment and plaintiff's motion will be denied as moot.

On a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Oates v. Dis-*

*covery Zone,* 116 F.3d 1161, 1165 (7th Cir. 1997). For the purpose of deciding defendant's motion for summary judgment, I find from the parties' proposed findings of fact that there is no genuine dispute with respect to the following material facts.

## UNDISPUTED FACTS

Plaintiff Equal Opportunity Employment Commission is an agency of the United States charged with the administration, interpretation and enforcement of Title VII of the Civil Rights Act of 1964. At all times relevant to this lawsuit, defendant TruGreen Limited Partnership has done business in Madison, Wisconsin.

In January 1993, Peter Potaczek began working as a sales representative at defendant's Madison branch. On February 16, 1995, Potaczek's employment with defendant ended. During the period of Potaczek's employment, Jeffrey Schaefer served as the marketing manager for the Madison branch and James Jasensky was the branch manager. On September 27, 1993, Schaefer suspended Potaczek for two days without pay after Potaczek admitted making loud noises in the ear of another sales representative as the representative spoke with a customer over the telephone. As a result, the customer declined to do business with defendant any longer. According to the report prepared by Schaefer, "Pete [Potaczek] then called [the] customer back and lied to them about their [sic] being a big 'shin dig' and Steve not being aware of it." In the report, Schaefer noted that Potaczek had engaged in similar "high jinx" including "making a fire on company property and setting [off] a 'stink bomb' ..."

After Schaefer had warned Potaczek not to write "100% weed control" on estimates provided to customers, Potaczek wrote "98% weed control." On April 12, 1994, Potaczek received a written warning for this conduct. On June 15, 1994, Schaefer issued a second written warning to Potaczek for leaving work early.

On September 9, 1994, Schaefer suspended Potaczek for three days without pay for insubordination. Schaefer had told Potaczek to generate $1,000 worth of sales. When Potaczek failed to reach this goal, he refused to work longer in order to make up the difference. On January 20, 1995, Schaefer suspended Potaczek for three days without pay for falsifying a sales report.

Potaczek is a born-again Christian. He is offended by pictures of nude women and by sexual banter and profanity. Schaefer had some knowledge of Potaczek's religious convictions. Both Schaefer and Potaczek had desks in the sales room at defendant's Madison branch. Jasensky's office was located next to the sales room. Sometime in 1993, an employee found an adult magazine and turned it over to Schaefer, who put it in a desk drawer where it remained for approximately the next month until Schaefer threw it away. Sometime in 1994, Schaefer brought a picture of a topless woman to work. He had found the picture at a gas station. Schaefer showed the picture to a few of his coworkers, asking at least one employee whether he thought the woman's breasts were "real" or "fake." On another occasion, Schaefer wrote "Pete Sucks" on a piece of paper that he knew Potaczek would see. Potaczek complained about Schaefer's conduct to Jasensky. During the period that plaintiff worked for defendant, Schaefer verbally reprimanded employees for making crude sexual remarks between five to ten times. He let employees engage in sexual banter so long as he did not consider it disruptive.

On the morning of February 16, 1995, one of Potaczek's coworkers, Mike Schlachter, lost consciousness and hit his face against the ground. As Jasensky attempted to assist Schlachter, Potaczek said, "You really did a number on your face, Mike." Upon hearing this, Jasensky told Potaczek to "shut the fuck up" because he was not helping matters. When Jasensky

refused to apologize for these statements, Potaczek quit.

On March 28, 1995, Potaczek filed a charge of religious discrimination against defendant with plaintiff. On August 3, 1995, plaintiff dismissed the charge. On October 24, 1995, Potaczek filed a second charge against defendant, contending that he had been sexually harassed and constructively discharged. Plaintiff found reasonable cause that Potaczek had been sexually harassed.

## DISPUTED FACTS

Potaczek contends that Schaefer directed a variety of sexually lewd remarks and conduct at him on a daily basis. Schaefer denies flatly that he ever used sexually explicit language or engaged in behavior with sexual overtones while at work, whether in the presence of Potaczek or any other employee.

Potaczek's version of events runs as follows. The objectionable conduct engaged in by Schaefer began about four to six months into Potaczek's employment with defendant and manifested itself in four different ways: verbal remarks; written remarks; distribution of magazines featuring naked women; comments and conduct directed at a family picture kept on Potaczek's desk. Most of the offensive comments allegedly made by Schaefer focused on Potaczek's wife, Lori. For example, Schaefer allegedly said: "I bet your wife's got a nice tight pussy." On days when Potaczek appeared cheerful, Schaefer would say, "Boy, you must have gotten a good blow job from your wife last night," or some variation on that theme. Schaefer told Potaczek that he wanted to ejaculate on Lori. Schaefer inquired about parts of her anatomy, asking whether Lori had "big boobs or little boobs or big nipples or little nipples." Questions about the skill with which Lori performed fellatio and other sexual acts rounded off Schaefer's repartée. In addition to making these comments, Schaefer allegedly wrote "anal rape" and "clit weed" on Potaczek's work materials. When Potaczek asked a customer over the telephone whether the customer knew Potaczek's mother, Schaefer allegedly scribbled "fuck mom" on a piece of paper near Potaczek. On a regular basis, Schaefer allegedly brought adult magazines to work and showed pictures from these magazines to everyone, including Potaczek. Schaefer enjoyed commenting on pictures featuring with women with large breasts. Jaskensky knew that Schaefer brought these magazines to work and occasionally admired them himself. The last type of behavior allegedly engaged in by Schaefer concerns the family photograph that rested on Potaczek's desk. According to Potaczek, Schaefer would grope, lick and kiss Lori's breasts and crotch, sometimes rubbing the picture against his body. Potaczek allegedly filmed one of these episodes but can no longer find the incriminating videotape.

In stark contrast to this account, Schaefer admits that on one occasion he "tapped" Potaczek's family picture in the vicinity of Lori's breasts "to be funny." Schaefer maintains that none of the other allegations made by Potaczek are true.

## OPINION

Recently, the Supreme Court held that workplace harassment can violate Title VII "when the harasser and the harassed employee are of the same sex." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1000, 140 L.Ed.2d 201 (1998). In *Oncale*, a man who worked on an off-shore oil platform sued his employer after his supervisor and some of his coworkers subjected him forcibly "to sex-related humiliating actions ... in the presence of the rest of the crew," physically assaulted him "in a sexual manner," and "threatened him with rape." *Id.* at 1001. The Court of Appeals for the Fifth Circuit upheld the dismissal of Oncale's claim, rejecting categorically the notion that conduct directed by one man toward another man could amount to actionable sexual harassment. The Supreme Court noted

that this opinion represented one of "a bewildering variety of stances" taken by state and federal courts regarding the viability of same-sex hostile work environment claims. *Id.* at 1002. According to the Court, the particular stance adopted by the Fifth Circuit is not compatible with either the operative language of Title VII or the settled precedent that a man can maintain an action for gender discrimination on the basis of an adverse job action taken by a male supervisor. *Id.* at 1001–02.

To dispel the fear that "recognizing liability for same-sex harassment will transform Title VII into a general civility code for the American workplace," the Court stressed that the statute prohibits " '*discriminat[ion]* . . . because of . . . sex,' " *id.* at 1002 (quoting 42 U.S.C. § 2000e 2(a)(1)), not "all verbal or physical harassment in the workplace." *Id.* The Court described three ways in which this showing could be made in a same-sex harassment lawsuit. First, the plaintiff could prove that sexual desire motivated the harasser. In this regard, it is important to remember that the term "sex" from Title VII is a reference to the victim's gender, not to carnal matters. Courts should not assign dispositive weight to certain conduct simply because it has sexual overtones. *See id.* ("We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations.") This qualification notwithstanding, an inference of discrimination can be easy to draw when a male employee propositions a female co-worker. *See id.* In these situations, "it is reasonable to assume that the proposals would not have been made to someone of the same sex." *Id.* Credible evidence indicating that the harasser is homosexual would justify extending this rationale to the arena of same-sex harassment. *See id.* Second, an inference of discrimination could be drawn "if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace." *Id.* Finally, the victim of same-sex harassment could prove discrimination by relying on "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace." *Id.* These three examples are illustrative, not exhaustive. *See Shepherd v. Slater Steels Corporation,* 168 F.3d 998, 1008 (7th Cir. 1999).

Like the Supreme Court, the Seventh Circuit has emphasized the importance of proving that discriminatory conduct is motivated by the victim's gender. *See, e.g., Galloway v. General Motors Service Parts Operations,* 78 F.3d 1164, 1168 (7th Cir. 1996). *Galloway* involved a female employee whose coworker and former boyfriend called her a "sick bitch" repeatedly over a four year period, told her, "if you don't want me, bitch, you won't have a damn thing" and said, "suck this, bitch" while making an obscene gesture. The court was unconvinced that the coworker's use of the term "bitch" had any connection with the plaintiff's gender or the fact that she belonged to a different gender from her tormentor. *See id.* at 1168. In other words, the court did not believe that the former boyfriend behaved as he did *because of* the plaintiff's gender: " 'bitch' . . . does not necessarily connote some specific female characteristic, whether true, false, or stereotypical; it does not draw attention to the woman's sexual or maternal characteristics or to other respects in which women might be thought to be inferior to men in the workplace, or unworthy of equal dignity and respect." *Id.*

The court of appeals has explored the difficulties of determining when discrimination is "because of" the victim's gender in the context of same-sex harassment. *See, e.g., Shepherd,* 168 F.3d 998, 1999 WL 80735; *Johnson v. Hondo, Inc.,* 125 F.3d 408 (7th Cir.1997); *Doe by Doe v. Belleville,* 119 F.3d 563 (7th Cir.1997). In *Doe,*

119 F.3d at 566, two brothers quit their summer jobs after being "subjected to a relentless campaign of harassment by their male coworkers," including their supervisor. The leader of this campaign, Dawe, focused his attention on one of the brothers, "H.," who wore an earring. Dawe and the others called H. a fag and a queer. Eventually, Dawe "took to calling H. his 'bitch' and said that he was going to take him 'out to the woods' and 'get [him] up the ass.'" *Id.* at 567. The harassment culminated when Dawe grabbed H. by the testicles and "announced to the assemblage of co-workers present, 'Well, I guess he's a guy.'" *Id.* From these facts, the court articulated two independent bases for determining that H. was harassed "because of" his gender. After underscoring the role that this requirement plays in a sexual discrimination claim, *see id.* at 570 (citing *Carr v. Allison Gas Turbine Division*, 32 F.3d 1007, 1009 (7th Cir.1994)), and concluding that Title VII does reach same-sex harassment, *see id.* at 570–574, the court questioned whether it is necessary to produce additional evidence to prove that a harasser has engaged in conduct "because of" the victim's gender "when the harassment has explicit sexual overtones." *Id.* at 576. In such cases, the question should not be whether the plaintiff has been harassed "because she was a woman *rather than* a man, or vice versa," but whether the harassing conduct has rendered the work environment hostile to her *as a woman* or vice versa. *Id.* at 577–580. Framing the question this way, the court of appeals had no trouble concluding that H.'s coworker harassed him because of his gender. *See id.* at 580. Implicit in this reasoning is the notion that courts should not apply different or more exacting standards in same-sex harassment cases simply because the harasser and victim are both male or both female. In *Oncale*, the Supreme Court expressed explicit disapproval of this reasoning. The Court characterized *Doe* as standing for the proposition "that workplace sexual harassment that is sexual in content is

always actionable, regardless of the harasser's sex, sexual orientation, or motivation." *Oncale*, 118 S.Ct. at 1002.

Perhaps anticipating such an outcome, the court of appeals articulated an alternative basis of liability, relying on *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), for the proposition that "Title VII does not permit an employee to be treated adversely because his or her appearance or conduct does not conform to stereotypical gender roles." *Doe*, 119 F.3d at 580. Expanding on this concept, the court reasoned that "a man who is harassed because his voice is soft, his physique is slight, his hair long, or because in some other respect he exhibits his masculinity in a way that does not meet his coworkers' idea of how men are to appear and behave, is harassed 'because of' his sex." *Id.* at 581. When applied to the conduct visited upon H., these principles indicated that he had been victimized because he wore an earring, "a fact that evidently suggested to his co-workers that he was a 'girl' or, in their more vulgar view, a 'bitch.'" *Id.* The court hastened to add that its holding would not result in a flood of Title VII litigation grounded in nothing more than sexually lewd remarks. There is a difference, the court explained, between an employee subjected to crude jokes and sexually explicit banter and an employee who "is made the unwilling target of repeated, sexually-charged and gender-based remarks, ... threatened with sexual assault, and ... subjected to unwelcome sexual contact." *Id.* at 591.

The allegations in *Johnson v. Hondo*, 125 F.3d at 410, centered on the conduct of an employee named Hicks, who threatened repeatedly to force Johnson or Johnson's girlfriend to perform oral sex on him. When issuing these threats, Hicks would grab or fondle his own crotch while standing within inches of Johnson, sometimes brushing up against him. "In return, Johnson would call Hicks a 'punk,' 'faggot,' 'fag,' and 's.o.b.'" *Id.* The court found that these facts did not show a nexus between

Hicks's conduct and Johnson's gender. *See id.* at 412. Foreshadowing the holding in *Oncale,* the court of appeals stated:

> Although explicit sexual content or vulgarity may often take a factfinder a long way toward concluding that harassing comments were in fact based on gender ... this need not necessarily be the case. Most unfortunately, expressions such as "fuck me," "kiss my ass," and "suck my dick," are commonplace in certain circles, and more often than not, when these expressions are used (particularly when uttered by men speaking to other men), their use has no connection whatsoever with the sexual acts to which they make reference—even when they are accompanied, as they sometimes were here, with a crotch-grabbing gesture. Ordinarily, they are simply expressions of animosity or juvenile provocation, and there is no basis in this record to conclude that Hicks' usage was any different.

*Id.* The behavior engaged in by Hicks amounted to "nothing other than vulgar provocations having no causal relationship to Johnson's gender as a male." *Id.* at 413. In contrast to the harassment aimed at the plaintiff in *Doe,* Hicks did not subject Johnson to an assortment of verbal and physical attacks, express hostility to the way in which Johnson exhibited his sexuality, target Johnson exclusively or make any reference to Johnson's gender. *See id.* at 413–14.

The harassing conduct chronicled in *Shepherd,* 168 F.3d 998, began innocently enough when a male employee named Jemison complimented the male plaintiff several times on his good looks. From here, Jemison developed a habit of playing with his penis in front of Shepherd four or five times a week. On one occasion, Shepherd turned his swivel chair only to be "confronted with the sight of Jemison's exposed penis being wagged inches from his face." 168 F.3d at 999. The situation deteriorated even further: "On another occasion ..., Shepherd was lying face-down on a bench in his work area to alleviate a bout of stomach cramps." When Shepherd looked up, he saw Jemison 'rubbing himself into an erection,' watching Shepherd.... Jemison told Shepherd, "[I]f you [don't] turn over, [I'm] liable to crawl on top of [you] and fuck [you] in the ass." *Id.* at 1000. Jemison's conduct grew cruder and more hostile after a supervisor spoke with him in response to a complaint lodged by Shepherd. The distinguishing feature of this stage of the harassment became Jemison's practice of dropping his pants in front of Shepherd.

On the basis of these allegations, the Seventh Circuit held that a reasonable fact finder could decide that "Jemison had harassed Shepherd because Shepherd is a man." *Id.* at 1000. Before reaching this conclusion, the court of appeals discussed the significance of *Oncale,* explaining that it "demonstrates that there is no singular means of establishing the discriminatory aspect of sexual harassment." *Id.* at 1000. Although the Supreme Court articulated three ways in which a plaintiff could make this showing, these examples are instructive, not exhaustive. *See id.* Turning to the merits, the Seventh Circuit found enough evidence to imply that "Jemison's harassment of Shepherd was borne of sexual attraction." *Id.* Under another reasonable interpretation of the facts, Jemison harassed Shepherd "simply because [Jemison] was exceedingly crude and/or because he knew that this type of sexually-charged conduct would make Shepherd uncomfortable." *Id.* at 1001. As in any case, when the undisputed facts are capable of supporting two competing inferences, such conflicts must be resolved "by the factfinder after trial, not [by] the court on summary judgment." *Id.*

*Shepherd's* most valuable contribution is not the way in which the court of appeals interpreted or applied *Oncale* but how the court distinguished the facts of *Shepherd* from *Johnson* in the wake of *Oncale.* The Seventh Circuit did not suggest that *Oncale* has diminished the precedential value

of *Johnson.* If anything, the court's discussion of these two opinions leaves the impression that *Oncale* has reinforced the central tenet of *Johnson,* namely, that "it is not at all unusual in some settings for people to taunt one another using profanity which, although facially sexual, has little or nothing to do with the gender of the individuals trading insults." *Shepherd,* 168 F.3d 998, 1001. In *Oncale,* the Supreme Court made a similar observation in the context of another aspect of a hostile work environment claim: the objective severity of the harassment. According to the Court, this requirement insures

> that courts and juries do not mistake ordinary socializing in the workplace—such as male-on-male horseplay or intersexual flirtation—for discriminatory "conditions of employment." . . . In same-sex (as in all) harassment cases, the inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. . . . The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing and roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile and pervasive.

*Oncale,* 118 S.Ct. at 1002–03. This reasoning applies with equal force to the task of determining when harassment is "because of" the victim's gender. *See Shepherd,* 168 F.3d 998, 1002. In this regard, the "campaign of harassment" undertaken by Jemison easily satisfied the operative standard. *Id.* Unlike the conduct at the center of *Johnson,* Jemison's behavior was not "essentially incidental to what was otherwise run-of-the-mill horseplay and vulgarity." *Id.*

This case illustrates effectively why the "because of" requirement plays such an important role in Title VII claims. To survive defendant's motion for summary judgment, plaintiff must present evidence of a causal relationship between Potaczek's gender and Schaefer's alleged conduct. Otherwise, Potaczek's checkered employment record with defendant, the other charge of discrimination that he filed with plaintiff and the allegation that Schaefer engaged in sexual banter and showed nude pictures to everyone in the office suggest possible explanations for Schaefer's behavior that have nothing to do with Potaczek's gender: Schaefer did not care for born-again Christians; Schaefer disliked Potaczek personally or professionally or both because of the number of times that he had to cite Potaczek for workplace misconduct; or Schaefer is generally a crude individual. Indeed, one of plaintiff's own witnesses has ascribed such a motive to Schaefer's behavior, explaining the situation as follows: "Pete was an easy going, fun person who often cheered up the work environment with his good humor. . . . Jeff continued to say sexual things to Pete [because] . . . Jeff didn't appreciate the fun and enjoyment Pete brought to the office. I think Jeff's way of punishing Pete was to deliberately not respect Pete's wishes about sexual remarks." Aff. of Michael Schlacter (Exh. B to Aff. of Henry Hamilton, dkt. # 82). One could infer reasonably that "fun and enjoyment" is a reference to the stink bomb and telephone incidents for which Potaczek received a two-day suspension. The description of the salesroom provided by Schlacter also lends credence to defendant's assertion that Schaefer's behavior amounted to nothing more than run-of-the-mill horseplay and vulgarity: "In our work setting, it was not unusual for employees and managers to curse and swear as well as make remarks with sexual content. For example, it was not unusual for us to remark about our sexual activity with our wives or partners." *Id.*

Despite the requirement that it show a causal relationship between Schaefer's conduct and Potaczek's gender, plaintiff has failed to come forward with evidence tending to support its assertion that Schaefer harassed Potaczek because of his gender. There is no meaningful way of distinguishing the facts of this case from conduct that did not amount to actionable sexual harassment in *Johnson*. Both cases turn on allegations that a male employee directed lewd, demeaning conduct and remarks steeped in sexual overtones toward a male coworker and the coworker's wife or girlfriend. This similarity may explain why plaintiff has restricted its discussion of *Johnson* to a footnote. Plaintiff tries to cast the conduct engaged in by Schaefer as something other than run-of-the-mill vulgarity with no connection to Potaczek's gender but its effort is unsuccessful. According to plaintiff, whereas "personal animosity" motivated the harassment in *Johnson,* "stereotypes of males and females" drove Schaefer to torment Potaczek. *See* Pl.'s Br. in Opp., dkt. # 67, at 13 n. 7. *See also id.* at 9 ("Schaefer stereotypically assumed that Potaczek was not offended by pornography.")

Plaintiff does not develop this gender stereotype theory fully but the argument appears to run as follows: after Potaczek told Schaefer to stop displaying pictures of naked women and making obscene comments about Potaczek's wife, Schaefer became even more determined to engage in this behavior out of contempt at the notion that a grown, heterosexual male. like Potaczek did not have a healthy appreciation for adult magazines and sexual banter. In other words, in the language of *Price Waterhouse* and *Doe,* Schaefer treated Potaczek adversely because Potaczek did not exhibit his masculinity in a way that met Schaefer's conception of how a man should behave. Although plaintiff could succeed on such a theory, it cannot do so without the facts to support the theory. It has failed to come forward with factual evidence sufficient to create a genuine dispute that Schaefer treated Potaczek adversely because Potaczek's conduct did not conform to stereotypical gender roles.

The lack of facts stems in part from plaintiff's failure to adhere to this court's summary judgment procedures. Plaintiff has proposed several facts that are not supported by citations to evidence in the record. In other proposed facts, it has mischaracterized the evidence cited in support of these facts. To make matters worse, many of the statements that do not conform with the court's rules have some connection to plaintiff's gender stereotype theory. For example, there is no citation accompanying the following proposed fact: "Potaczek told Schaefer that he did not welcome [sexual] comments in his presence." Pl.'s Prop. Findings of Fact, dkt. # 68, at ¶ 84. In its brief, plaintiff asserts that, despite Potaczek's protests, Schaefer made "derogatory remarks about ... female applicants" and asked "Potaczek whether he could have sex with Mrs. Potaczek." Dkt. # 67 at 3. Again, these statements are not linked to proposed facts. As stated in section five, paragraph E of this court's standing order on procedures to be followed on motions for summary judgment:

> *The court does not consider that it is under any obligation to search the record for factual matters that might support either the grant or the denial of the motion.* It is the duty of the parties to bring to the court's attention by specific reference to the record ... all factual and legal matters material to the resolution of the issues in dispute.

Further, the order states that a "response shall refer to the pleadings, deposition transcripts, answers to interrogatories, admissions on file, or affidavits" when asserting that a genuine dispute exists.

Of even greater concern are the liberties that plaintiff has taken with deposition testimony. Citing Schaefer's deposition, dkt. # 91, plaintiff proposes as a fact that "Schaefer assumed that his pornographic materials would not be offensive to Potac-

zek." Dkt. # 68 at ¶ 81: Referring to the same proposed finding of fact, plaintiff's brief contains the assertion that Schaefer would compare pictures of women in his adult magazines to Schaefer's wife and ask "in front of all the employees in the Tru-Green sales room, whether Mrs. Potaczek could bend like the centerfold in one of the magazines . . ." Dkt. # 67 at 4. Neither of these statements is supported by the passage from Schaefer's deposition that plaintiff cites. Even if these problems did not exist, plaintiff still could not create a genuine dispute that the vulgar behavior allegedly engaged in by Schaefer had anything to do with Potaczek's gender. There is no suggestion that Schaefer used gender-specific, derogatory terms in response to Potaczek's aversion to sexually explicit banter and photographs. Potaczek does not contend that Schaefer called him a sissy or a queer or otherwise questioned his masculinity or sexual orientation. In this regard, plaintiff derives no support from *Chiapuzio v. BLT Operating Corp.*, 826 F.Supp. 1334, 1337–38 (D.Wyo.1993) (male supervisor questioned plaintiff's sexual prowess by asserting that supervisor could please plaintiff's wife sexually better than plaintiff). Factual distinctions aside, in *Chiapuzio*, the district court erred in applying a "but for" analysis to determine that a causal relationship existed between the male plaintiffs and the harassing conduct. *See id.* at 1336. Under a "but for" standard, sexually lewd remarks made in the presence of a heterosexual male employee about the employee's wife or girlfriend would always be gender-motivated; "but for" the employee's gender (and sexual orientation), he would not be associated intimately with a woman. Needless to say, this would render meaningless the Seventh Circuit's admonition that vulgar behavior is commonplace in some social circles and often bears only an incidental relationship to the gender of the person at whom such behavior is directed. *See Shepherd*, 168 F.3d 998, 1001; *Johnson*, 125 F.3d at 412. Taking the reasoning endorsed in *Chiapuzio* a giant step further, plaintiff suggests that a "reasonable juror could find that, but for Potaczek's sex, Schaefer would not have directed his sexually demeaning conduct and language at Potaczek's spouse. In other words, if Schaefer had been the same sex as Potaczek's spouse, he would not have expressed his desire to have sex with, or have an orgasm on, Mrs. Potaczek." Dkt. # 67 at 11. Maybe so, but this syllogism stands the operative question on its head, focusing on the gender of the harasser, not the victim. Finally, plaintiff places great emphasis on Schaefer's concession that he would not direct sexually explicit remarks or behavior at a (non-existent) female employee. Plaintiff overlooks a crucial point: Schaefer maintains that he would never conduct himself in this manner toward *anyone*, male or female.

## ORDER

IT IS ORDERED that:

1. The motion of defendant TruGreen Limited Partnership for summary judgment is GRANTED; and

2. Plaintiff Equal Employment Opportunity Commission's motion for partial summary judgment is DENIED as moot.

3. The clerk of the court is directed to enter judgment in favor of defendant and close this case.